BAUER et al. v. MYERS et al.

(Circuit Court of Appeals, Eighth Circuit. April 5, 1917.)

No. 4532.

1. WILLS ⚜️166(4)—VALIDITY—CONSTRUCTION OF STATUTE—"PRINCIPAL BENEFICIARY."

Gen. St. Kan. 1909, § 9787, provides that "in all actions to contest a will, if it shall appear that such will was written or prepared by the sole or principal beneficiary in such will, who, at the time of writing or preparing the same, was the confidential agent or legal adviser of the

⚜️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

testator, or who occupied at the time any other position of confidence or trust to such testator, such will shall not be held to be valid unless it shall be affirmatively shown that the testator had read or knew the contents of such will, and had independent advice with reference thereto." *Held*, that one who, by the will of a testatrix, was made trustee of a large part of her estate, to invest and reinvest the same and pay over the income for certain stated purposes, but whose only pecuniary interest was under a provision that he should "be paid reasonable compensation for his services," was not the "principal beneficiary" in the will, within the meaning of the statute, and that such statute had no application to him.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Principal Beneficiary.]

2. PERPETUITIES ⊝⇒8(1)—EXCEPTION TO RULE AGAINST TRUSTS FOR PUBLIC CHARITABLE USES.

At the common law and in the federal courts, the rule against perpetuities has no application to a bequest for charitable uses, and a bequest of a sum of money in trust, the net income to be paid over annually to the mayor of a city, to be by him "expended in the assistance and support of the poor of said city," creates a trust for a public charitable purpose, and is valid, although the trust is in perpetuity; and such trust is not invalidated by the fact that the principal sum does not go to charity, or because the state cannot directly appropriate money for the support of the poor.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suit in equity by Caroline Bauer and others against John Q. Myers and others. Decree for defendants, and complainants appeal. Affirmed.

J. G. Hutchison, of Kansas City, Mo. (J. E. Boruff and Ray R. Boruff, both of Bedford, Ind., and Wm. T. Jamison and Howard L. Jamison, both of Kansas City, Mo., on the brief), for appellants.

James A. Troutman, of Topeka, Kan., for appellee Board of Foreign Missions of Methodist Episcopal Church.

F. T. Woodburn and Charles Hayden, both of Holton, Kan. (E. D. Woodburn, of Holton, Kan., on the brief), for other appellees.

Before HOOK and SMITH, Circuit Judges, and REED, District Judge.

PER CURIAM. This was brought as an action in equity in the United States District Court of Kansas to set aside the will and the probate thereof of Mrs. Louise Sitzler, who died on Monday, April 15, 1912. The will was executed Saturday, April 13, 1912. It is alleged in the bill of complaint that the will was offered for probate and probated in common form in the probate court of Jackson county, Kan., in April, 1912. The bill in this case was filed January 31, 1914, and all the defendants were served with chancery subpœnas, either personally or by publication, or not found, within the two-year statute of limitations. The District Court rendered a decree in favor of the defendants, and the plaintiffs appeal.

The evidence shows that the deceased was born in the town of Martinshohe, Pfalz, Bavaria, now in the Empire of Germany, in Feb-

ruary, 1834. She attended school in Germany from her sixth to her thirteenth year. She came to the United States about 1853, at about 19 years of age and has lived in the United States until her death, or about 59 years. She moved to Pennsylvania and there married John Sitzler, and moved with her husband to Kansas about 1858, when she was about 24 years old, and continued to live there until her death, a period of 54 years. She conversed in German or English, and read Bibles in both languages. Her English speech was characterized as broken. She had during most of her life no lucrative calling, except as she was an aid to her husband. It appears that John Sitzler in his lifetime had converted substantially his whole estate, except his homestead and household furniture, into money and turned it over to Mr. John Q. Myers, as president of the State Bank of Holton, who is the same person named as defendant in this action, with an agreement that it should be loaned upon security approved by Sitzler; that Myers, as president, would account for 4 per cent. interest upon it. At the time of his death he had been acquainted with Myers about a quarter of a century, and twice a year Myers called upon Sitzler at his home to settle up this interest charge. John Sitzler died January 23, 1912, leaving a will in favor of his wife, Louise Sitzler, of all his worldly goods. His estate was inventoried at $48,393.34. After his death his widow, Louise Sitzler, renounced her right to be appointed administratrix, there being no executor named in the will, and the defendant Myers was appointed administrator c. t. a. He was in possession of the estate as such administrator when Louise Sitzler died. Of course he never took possession of the home or household furniture of the parties. John Sitzler was in the habit of advising with John Q. Myers about all his investments of the sum turned over by Sitzler to Myers. The deceased took her bed Thursday evening, April 11, 1912, and died of pneumonia the following Monday. Katie Grauer had lived with this old couple for about 11 years before their deaths. She testified:

"She [testatrix] and her husband and I composed the family. She did what business was done. She generally done the counting. When he came home from town, she generally counted things up."

This old couple left no children surviving them, and Mrs. Ray testifies concerning deceased:

"I call her a bright business woman. * * * She could read English. She could read out of the Bible to me; read it in English; read it in German. * * * Of course, she read our home papers, and have heard her read the dailies. I heard her talk about the disposition of her property she intended to make. * * *"

The same witness testified:

"Mrs. Sitzler didn't say the amount; she said she and her husband had agreed to treat the relatives equally; to divide equally between his people and her people, whatever they gave hers; to give the same to her relatives and to his."

Lelia Lindley called on deceased at 3 or 4 o'clock on Saturday before her death. She had known the deceased ever since the witness

was a child. She had been a school-teacher for 36 years at the time she testified. She said the deceased was an intelligent woman, and she was just as bright at this last interview as she ever was.

Mrs. Sigmund testified:

"I heard the discussion of the lawyers to draw the will. Mr. Price's name was mentioned first; wanted to send for the lawyers, and Mr. Price's name was mentioned first, and then another man's, but I don't remember; and then some one suggested Mr. Crane, and they decided on Mr. Crane; and then Mr. Myers' name was mentioned, but I couldn't say whether it was Mrs. Nauheim or who mentioned the names. In this conversation about the lawyers and Mr. Myers, they were all three kind of talking, Mrs. Sitzler, Mrs. Nauheim, and Dr. Seavers."

When the deceased was about and well, she promised Mr. Morton Maiers and wife some potatoes for seed, saying that she had more than she needed now that Mr. Sitzler was dead. Between 3 and 4 o'clock on Saturday, the 11th of April, 1912, on the day she made her will, at about 4 or 5 o'clock, they called to see her. Katie Grauer asked Mrs. Maiers if they had bought any seed potatoes, and Mrs. Maiers having answered they had bought some, the deceased spoke up and said to give her some. After the discussion testified to by Mrs. Sigmund, some one telephoned to Mr. Myers, and he took Mr. Crane down to the house, and Mr. Crane made full notes of what Mrs. Sitzler wanted to do with her property, went back to his office, and left the notes of the proposed will with Mr. Woodburn and went to the courthouse to try a case. Upon his return Mr. Woodburn had the will drawn, and they then compared the will with the notes, then Mr. Crane went to the bank, saw Mr. Myers, and they got in the buggy and drove back down to the house of Mrs. Sitzler. Mr. Crane testified he then read every word of the will to Mrs. Sitzler.

The first item of the will was a direction for the payment of all her just debts, including funeral expenses. The second and third items of the will gave to Katharine Grauer, being the one heretofore referred to as Katie Grauer, the homestead of the parties and the household goods and furniture. The fourth to the fourteenth items of the will gave to the relatives of herself and of her husband $500 each. The fifteenth item gave a like sum to Lawrence Whitcroft, who was the child of a foster daughter of the deceased. The sixteenth item, as originally prepared, read as follows:

"I do give and bequeath to John Q. Myers the sum of ten thousand dollars ($10,000.00) in trust, nevertheless, to and for the following uses and purposes, that is to say: The said trustee, and his successors in trust, shall invest and reinvest the said sum of ten thousand dollars ($10,000.00) in such securities as will bring the largest income, consistent with perfect security, giving preference to first real estate mortgages and shall pay the net income thereof to Katharine Grauer for her support and maintenance during her natural life and at and forever after death the net income thereof shall be paid annually on December 1st of each year to the Board of Foreign Missions of the Methodist Episcopal Church."

When this was read to the deceased she said that:

"She had been thinking about that matter during the day, and that she didn't want that money held in perpetual trust after the death of Katie Grauer, but that she wanted it paid at her death to the church absolutely."

Mr. Crane testified:

"She asked me if I could change that will without too much trouble. I said, 'Yes, I can interline it.' And I asked for a pen and ink, and a pen and ink was brought, and I wrote. * * * That is my handwriting; I made that change at her request. She said she thought it over and concluded she wanted it that way, and she said the will was all right, just as she wanted it, and then we got Mrs. Nauheim, who is now dead, and Mrs. Morrow, she said they were satisfactory to her as witnesses, and we asked them if they would sign as witnesses, and they did, and it was signed there in the presence of everybody."

This item, as thus amended, read when signed:

"Item XVI. I do give and bequeath to John Q. Myers the sum of ten thousand dollars ($10,000.00) in trust, nevertheless, to and for the following uses and purposes, that is to say:

"The said trustee, and his successors in trust, shall invest and reinvest the said sum of ten thousand dollars ($10,000.00), in such securities as will bring the largest income, consistent with perfect security, giving preference to first real estate mortgages and shall pay the net income thereof to Katharine Grauer for her support and maintenance during her natural life, and at her death to be paid to the Board of Foreign Missions of the Methodist Episcopal Church to promote its purposes."

Items 17 and 18 of the will are as follows:

"Item XVII. I do further give and bequeath to the said John Q. Myers the further sum of three thousand dollars ($3,000.00) in trust for the following uses and purposes, to wit: The said trustee and his successors in trust shall invest and reinvest said sum in good securities such as will yield the largest income, consistent with perfect safety, giving preference to first real estate mortgages and shall annually pay the net income thereof to the mayor or other chief municipal officer of the city of Martinshohe, Pfalz, Bavaria, to be by him expended in the assistance and support of the poor.

"Item XVIII. I do further give, devise and bequeath to the said John Q. Myers, all of the rest and residue of my estate remaining after the payment of the preceding bequests in this will made, in trust, however, for the following uses and purposes, to wit:

"The said trustee and his successors in trust shall invest and reinvest the said remainder of my estate in good securities, such as will bring the best income consistent with perfect security, giving preference to first real estate mortgages and shall annually pay the net proceeds thereof to the mayor of the city of Holton, Jackson county, Kansas, to be by him expended for the assistance and support of the poor of said city."

Item 19, the last, appoints John Q. Myers executor of the will.

The bill sought the relief asked upon numerous grounds: First, want of testamentary capacity. The evidence that the deceased at the time of the making of the will was of sound and disposing mind and memory is overwhelming, and without saying there was absolutely no evidence of lack of testamentary capacity we are compelled to say that the finding of such capacity is not only abundantly sustained by the evidence, but it is gravely doubtful whether any other finding on that subject would be sustained by an appellate court.

Second, undue influence; third, fraud; fourth, that because of her extremely weakened physical condition, limited education and experience, imperfect knowledge of the English language, she could not and did not understand its contents. All of these contentions were overruled by the trial court on the evidence, and rightly so.

It was quite natural for the deceased to send for the defendant, John Q. Myers, who was the long-time friend of her late husband and his trusted agent in the handling of all the estate she was about to devise and bequeath. There is no evidence that he even offered suggestions as to the will, much less that he urged anything with reference to it. It is true that one of the counsel for the defendant in the opening statement said:

"On Saturday preceding her death, she was ill, quite ill, and expressed a desire to execute a will, and requested that Mr. John Q. Myers, who was the administrator with will annexed of her husband's estate, should be sent for. Mr. Myers, upon receiving this word by telephone, called up his attorney, Mr. A. E. Crane, who is, of course, well known to your honor, and these two gentlemen went down together to the residence of Mrs. Sitzler," etc.

We realize that in Oscanyan v. Arms Co., 103 U. S. 261, 26 L. Ed. 539, it was held that the court could direct a verdict for the defendant upon the opening statement of counsel for the plaintiff, if it showed his client was not entitled to a verdict, and we shall assume that the same rule applies to a defendant's opening statement, and that, if it showed the defendant was not entitled to a verdict, a motion for a directed verdict for the plaintiff should be sustained. We are aware that this case has been cited and followed by the Supreme Court some eight times, but in the original opinion the court said:

"Of course, in all such proceedings nothing should be taken, without full consideration, against the party making the statement or admission. He should be allowed to explain and qualify it, so far as the truth will permit; but if, with such explanation and qualification, it should clearly appear that there could be no recovery, the court should not hesitate to so declare, and give such direction as will dispose of the action."

The evidence of the witness Sigmund clearly showed that before the deceased saw the defendant Myers at all on the subject Mr. Crane was selected to draw this will, and it was therefore not in his capacity as attorney for Myers, but in his capacity as attorney for Mrs. Sitzler, that he attended and drew the will, and the fact that Mr. Myers was utilized to call him does not change the fact. The statement that "Mr. Myers, upon receiving this word by telephone, called up his attorney, Mr. A. E. Crane," does not say he called him up in his capacity as his attorney; but aside from this there is no evidence of any undue influence upon the part of Mr. Crane in the matter of the drawing of the will, save that it is claimed that the creation of Myers as trustee under the sixteenth, seventeenth, and eighteenth items was suggested by him. This will be considered later.

The deceased made this will in accordance with her previous agreement with her husband, and displayed great intelligence in its drafting, which she absolutely dictated, with the possible exception hereafter noted. There was no fraud practiced upon her, and the court was absolutely right in rejecting the second, third, and fourth objections made.

[1] The Kansas General Statutes of 1909 contained the following:

"Sec. 9787. That in all actions to contest a will, if it shall appear that such will was written or prepared by the sole or principal beneficiary in such will, who, at the time of writing or preparing the same, was the confidential agent

or legal adviser of the testator, or who occupied at the time any other position of confidence or trust to such testator, such will shall not be held to be valid unless it shall be affirmatively shown that the testator had read or knew the contents of such will, and had independent advice with reference thereto."

It is upon this statute.that the fifth objection is based:

"That it [her will] was prepared by, or under the direction of, the principal beneficiary, and procured by him to be signed and declared by Louise Sitzler to be her last will and testament, without her having independent advice, as required by section 9787, General Statutes of Kansas of 1909."

The appellants say this raises the following questions: First, was the will written or prepared by the defendant Myers, within the meaning of this statute? Second, is he the principal beneficiary in the will, within the meaning of this statute? Third, was he the confidential agent of, or did he sustain any other relation of confidence or trust to, the testatrix? Fourth, did she have any independent advice concerning said will?

These questions can all be readily answered. The will was not written, prepared, or dictated by the defendant Myers. It was written and prepared solely by Mr. A. E. Crane, who was the individual attorney of the testatrix, and engaged solely in that capacity, although he may have also been the regular attorney of Mr. Myers. Mr. Myers is not the principal beneficiary in the will, as that term is used in the statute. While he is made trustee of much of the property, it is not at all for his benefit; but he would be held strictly to account for the whole thereof by the court having the matter in charge. We can well accept the definition contended for of "beneficiary." A beneficiary is defined as one who receives a benefit or advantage, according to Webster's International Dictionary, or one who is in the receipt of benefits, profits, or advantage, according to the Century Dictionary. It is said by appellants:

"The word has no fixed or technical meaning, and may mean one thing in one place and another in another."

Myers was not the principal beneficiary, and there is nothing in Kelty v. Burgess, 84 Kan. 678, 115 Pac. 583, to indicate otherwise.

It is claimed that the provision that Mr. Myers "be paid reasonable compensation for his services," makes him the principal beneficiary. Of course, as trustee he would be entitled to reasonable compensation from the court administering the trust, in the absence of any such provision in the will, so the provision gave him absolutely nothing; but there is another reason the amount allowed him was to be just compensation for services rendered, and he was to receive nothing except as he earned it. So while he might owe a debt of gratitude to the testatrix for appointing him to this office in preference to another, and thus giving him an opportunity to earn this money, he would owe this. money to his time and labor expended, and not to the bequest under the will. The method by which the appellants compute the probable amount he will get per annum, and then estimate the receipts during his lifetime from this sum, is ingenious, but not persuasive.

The third and fourth questions propounded under this statute might both be assumed to be answered in the affirmative, without admitting

that such assumption is necessary, and still the statute has nothing to do with the case. The property covered by this will was all primarily the earnings of John Sitzler, and he had arranged his widow should have it all, and divide such as was left, and she wished to so divide equally between each individual relative of his and hers. This she did, and gave a part to one who, when all her own relatives had remained away from her in her extreme age, had stayed and cared for her for 12 years. Her relatives now seek to deprive his relatives and this good woman, who cared for her, of any portion of this estate, and absorb it all on specious complaints of undue influence, fraud, etc. Mrs. Sitzler had earned no part of this money, except as a good help-meet. This court is not predisposed to reverse the court below merely because it refused to rob the heirs of John Sitzler, who earned the money, and the woman who had cared for John Sitzler and his old wife, to give it to the heirs of Louise Sitzler.

[2] The only serious questions which arise on this appeal are with reference to items 16, 17, and 18 of the will. Aside from other questions, they are all assailed as in violation of the law against perpetuities. The Supreme Court of Kansas, in Keeler v. Lauer, 73 Kan. 389, 393, 85 Pac. 541, 543, speaking of the law against perpetuities, said: "Having no statute on the subject, the common-law rule prevails." It is therefore best to see what the common-law rule is, as determined by the federal courts, unhampered by state court decisions under stat-utes modifying the common law, and if the result should be found to be not settled by the United States courts we may then turn to the decisions of the state courts.

In Potter v. Couch, 141 U. S. 296, 314, 11 Sup. Ct. 1005, 1010 (35 L. Ed. 721), it is said that the rule against perpetuities was one which "prohibits the tying up of property beyond a life or lives in being and 21 years afterwards." In Inglis v. Sailors' Snug Harbor, 3 Pet. 99, 144 (7 L. Ed. 617) Mr. Justice Johnson said:

"It is altogether an act of judicial legislation, operating as a proviso to the statute of wills; a restriction upon the testamentary power. The authority from which the exception emanated could certainly limit it, so as to prevent its extension to an object under the care of the sovereign power."

It was apparently in recognition of what was thus said by Mr. Justice Johnson that the Supreme Court in Fitchie v. Brown, 211 U. S. 321, 334, 29 Sup. Ct. 106, 110 (53 L. Ed. 202) said:

"It is not necessary to find in the will, in so many words, the selection 'of lives, but that such selection is good if from a consideration of the whole will that selection can be ascertained."

In Ould v. Washington Hospital, 95 U. S. 303, 313 (24 L. Ed. 450) it is said:

"Charitable uses are favorites with courts of equity. The construction of all instruments where they are concerned is liberal in their behalf. Mills v. Farmer, 19 Ves. 487; McGill v. Brown, supra [Brightly, N. P. (Pa.) 346, note]; Perry on Trusts, § 709. Even the stern rule against perpetuities is relaxed for their benefit."

In Russell v. Allen, 107 U. S. 163, 166, 2 Sup. Ct. 327, 330 (27 L. Ed. 397), it is said:

"By the law of England from before the Statute of 43 Eliz. c. 4, and by the law of this country at the present day (except in those states in which it has been restricted by statute or judicial decision, as in Virginia, Maryland, and more recently in New York), trusts for public charitable purposes are upheld under circumstances under which private trusts would fail. Being for objects of permanent interest and benefit to the public, they may be perpetual in their duration, and are not within the rule against perpetuities; and the instruments creating them should be so construed as to give them effect, if possible, and to carry out the general intention of the donor, when clearly manifested, even if the particular form or manner pointed out by him cannot be followed. They may, and indeed must, be for the benefit of an indefinite number of persons; for, if all the beneficiaries are personally designated, the trust lacks the essential element of indefiniteness, which is one characteristic of a legal charity. If the founder describes the general nature of the charitable trust, he may leave the details of its administration to be settled by trustees under the superintendence of a court of chancery; and an omission to name trustees, or the death or declination of the trustees named, will not defeat the trust, but the court will appoint new trustees in their stead."

For the reasons indicated in this opinion the opinions in New York, Maryland, and the District of Columbia, which is governed by the laws of Maryland at the date of its cession to the United States subject to subsequent modifications, will not need to be considered by us in this opinion.

In Jones v. Habersham, 107 U. S. 174, 185, 2 Sup. Ct. 336, 346 (27 L. Ed. 401), it is said in reference to a bequest to a charity and upon its termination to another charity that:

"If those conditions are valid, the devise over to the Savannah Female Orphan Asylum, an undoubted charity, will take effect; for as the estate is no more perpetual in two successive charities than in one charity, and as the rule against perpetuities does not apply to charities, it follows that if a gift is made to one charity in the first instance, and then over to another charity upon the happening of a contingency which may or may not take place within the limit of that rule, the limitation over to the second charity is good."

In Hopkins v. Grimshaw, 165 U. S. 342, 352, 17 Sup. Ct. 401, 405 (41 L. Ed. 739), it is said:

"The first inquiry which naturally arises is whether the deed was for a charitable use, in the legal sense. If it was, the conveyance would not be open to any legal objection by reason of the length of time during which the trust might last, or because of the society named not being a corporation. Ould v. Washington Hospital, 95 U. S. 303 [24 L. Ed. 450]; Russell v. Allen, 107 U. S. 163, 171 [2 Sup. Ct. 327, 27 L. Ed. 397]. And the trustees, although the deed did not in terms run to their heirs and assigns, would take the legal estate in fee. Russell v. Allen, above cited; Potter v. Couch, 141 U. S. 296, 309 [11 Sup. Ct. 1005, 35 L. Ed. 721]; Easterbrooks v. Tillinghast, 5 Gray [Mass.] 17, 21."

To the same effect are Duggan v. Slocum, 34 C. C. A. 676, 92 Fed. 806; Brigham v. Peter Bent Brigham Hospital et al., 67 C. C. A. 393, 134 Fed. 513; White v. Keller, 15 C. C. A. 683, 68 Fed. 796. See Handley v. Palmer, 43 C. C. A. 100, 103 Fed. 39.

In Wood v. Paine (C. C.) 66 Fed. 807, it is declared that a charitable trust will not be held void because of uncertainty of beneficiaries or incapacity of the trustees to take, as a court of chancery will not permit a charitable trust to fail for want of a trustee or because its particular purposes are uncertain.

It thus seems clear that, however the law may be elsewhere in the federal courts, the rule against perpetuities has no application to a bequest for charitable uses. All gifts for the promotion of education are charitable ones. Russell v. Allen, 107 U. S. 163, 172, 2 Sup. Ct. 327, 27 L. Ed. 397. And the term "charitable uses" embraces a wide scope, including religious uses.

In Ould v. Washington Hospital, 95 U. S. 303, heretofore cited, on page 310 (24 L. Ed. 450), it is said that the Statute of 43 Elizabeth, c. 4, names 21 distinct charities: "They are * * * (10) of churches" and refers apparently with approval to the opinion of Mr. Justice Baldwin in McGill v. Brown, Brightly, N. P. (Pa.) 346, note, in which he found that there were 46 specifications of pious and charitable uses recognized as within the protection of the law in which were embraced all that were enumerated in the Statute of Elizabeth. In Perry on Trusts it is said that charitable trusts include all gifts in trust for religious and educational purposes, and in 1 Beach on Trusts, § 322, it is said:

"In distinction from an express private trust, which, by the definition, is designed for the benefit of one or more individuals, the trust for charitable purposes is a public trust, and from the nature of the case the beneficiaries are, to a greater or less extent, unknown or indefinite. Ordinarily the trust is designed for the benefit of a class, the individuals of which can be designated only in general terms. In a private trust, if the beneficiary or beneficiaries are not definitely and positively named, the trust fails on the ground of indefiniteness. But in a charitable trust the beneficiaries need not be definitely named, and even where there is no adequate designation of a cestui que trust, the trust will be enforced in equity if the intention of the settlor can be ascertained beyond a reasonable doubt. Trusts for charitable purposes are regarded by courts of equity with special favor, and a much more liberal construction will be put upon an instrument creating such a trust than upon one creating a trust for individuals. A will creating a trust for a charitable purpose will receive, where there is occasion for it, a construction differing very widely from that which would be applied to a trust for an individual."

In Jackson v. Phillips, 14 Allen (Mass.) 539, 550, Mr. Justice Gray said:

"By the law of this commonwealth, as by the law of England, gifts to charitable uses are highly favored, and will be most liberally construed in order to accomplish the intent and purpose of the donor; and trusts which cannot be upheld in ordinary cases, for various reasons, will be established and carried into effect when created to support a gift to a charitable use. The most important distinction between charities and other trusts is in the time of duration allowed and the degree of definiteness required. The law does not allow property to be made inalienable, by means of a private trust, beyond the period prescribed by the rule against perpetuities, being a life or lives in being and 21 years afterward; and if the persons to be benefited are uncertain and cannot be ascertained within that period, the gift will be adjudged void, and a resulting trust declared for the heirs at law or distributees. But a public or charitable trust may be perpetual in its duration, and may leave the mode of application and the selection of particular objects to the discretion of the trustees."

In Pomeroy's Equity Jurisprudence, § 1018, it is said:

"In express private trusts there is not only a certain trustee who holds the legal estate, but there is a certain specified cestui que trust clearly identified or made capable of identification by the terms of the instrument creating

the trust. It is an .essential feature of public or charitable trusts that the beneficiaries are uncertain—a class of persons described in some general language, often fluctuating, changing in their individual members, and partaking of a quasi public character. The most patent examples are 'the poor' of a certain district in a trust of a benevolent nature, or 'the children' of a certain town, in a trust for educational purposes. In such a case it is evident that all the beneficiaries can never unite to enforce the trust; for even if all those in existence at any given time could unite, they could not include nor bind their successors. It is a settled doctrine in England and in many of the American states that personal property and real property, except when prohibited by statutes, may be conveyed or bequeathed in trust, upon charitable uses and purposes, for the benefit of such uncertain classes or portions of the public, and that if the purposes are charitable, within the meaning given to that term, a court of equity will enforce the trust. Furthermore, it is one of the most important and distinctive features of charitable trusts that, however long the period may be during which they are to last, even though it be absolutely unlimited in its duration, they are not subject to nor controlled by the established doctrines, nor even the statutes which prohibit perpetuities. Indeed, it may be said that the full conception of a charitable trust includes the notion that it is or may be perpetual."

It has been repeatedly held that trusts for the benefit of sectarian churches are charities. Note II, 6 L. R. A. (N. S.) 321. In 5 Ruling Case Law, page 291, a charity is defined:

"It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature. Another definition, capable of being easily understood and applied, is that given by Lord Camden as follows: 'A gift to a general public use, which extends to the poor as well as the rich.' The theory of this is that the immediate persons .benefited may be of a particular class, and yet if the use is public in the sense that it promotes the general welfare in some way, it has the essentials of a charity. Again, charity has been declared to be active goodness; the doing good to our fellow men, fostering those institutions that are established to relieve pain, to prevent suffering, and to do good to mankind in general, or to any class or portion of mankind."

And on page 293:

"The essential elements of a public charity are that it is not confined to privileged individuals, but is open to the indefinite public. * * * Notwithstanding these general rules, it is usually held that a charity is none the less public because it is limited in its operation to the members of a particular sect or society, so long as it is wholly altruistic in the end to be attained and no private or selfish interest is fostered under the guise thereof."

And again on page 295:

"The requisites of a valid private trust, and of one for a charitable use, are materially different. In the former there must not only be a certain trustee who holds the legal title, but a certain specified cestui que trust, clearly identified, or made capable of identification, by the terms of the instrument creating the trust; while it is an essential feature of the latter that the beneficiaries are uncertain, a class of persons described in some general language, often fluctuating, changing in their individual members and partaking of a quasi public character. The most important distinction, however, between charities and other trusts is that in the time of duration allowed and the degree of definiteness required. Trusts for public charitable purposes, being for objects of permanent interests and benefit to the public, and perhaps being perpetual in their duration, are upheld under circumstances under which private trusts would fail."

We have said enough to indicate that in our judgment these three items all created trusts for support of public charities and wholly di-

vested any right which the plaintiffs and others may have had in the residue of the property, and the plaintiffs have no interest in the method by which a court of equity will work out the details of the trust created.

It is very strenuously insisted that the testatrix did not contemplate these trusts at all. She did contemplate, according to the evidence, that Mr. Myers should be the executor of the will, as that was discussed. Mr. Crane advised her these trusts were necessary to make the will legal, and especially as to the trust for the benefit of the poor of Martinshohe; that interest rates in Kansas were higher than interest rates in Bavaria, and that it would increase the amount of her charity given to the poor at Martinshohe to create a trust in America and keep the funds loaned here. For the purpose of disposing of this point, and for no other, we will assume that Mr. Crane was mistaken in his suggestion that a trustee was necessary in order to make the items legal; still there is nothing to indicate he was not honest in his advice. The testatrix, when the sixteenth item was read, said she wanted that money to go to the Board of Foreign Missions of the Methodist Episcopal Church at the death of Katie Grauer, and did not want it held in perpetual trust, and Mr. Crane corrected the will for the purpose of carrying out her purpose. Every word of the will was read to the testatrix, and her action in relation to the sixteenth item shows she knew and understood the appointing Myers trustee. Being of the opinion a trustee was necessary in these items, Mr. Crane asked Mr. Myers, who had already been designated by Mrs. Sitzler as executor of the will, on their way back from the consultation at the deceased's house, if he would act as trustee.

The evidence shows that Mr. Myers' relations to the parties and the estate were such that he would be the one she would naturally have selected for that office. This opinion might well end here with an affirmance; but appellants filed an elaborate argument to prove that as changed the language of item 16 is not ambiguous. Let it be conceded that upon its face it is not. Then appellants argue that, if there is an ambiguity, it is patent, not latent, and cannot be explained by parol evidence. These two positions are inconsistent with one another. In the recent case of David Graham et ux. v. National Surety Co., 244 Fed. 914, —— C. C. A. ——, we reviewed a number of text-book authorities on this subject, and without further discussion, if, as contended, the will is not ambiguous on its face, the evidence showing clearly that the change was made for the purpose of vesting the principal of the bequest in the Board of Foreign Missions of the Methodist Episcopal Church, the instrument will be so construed, even if it becomes necessary to construe the will by other than the rules of English grammar. 2 Underhill on Law of Wills, page 1385.

It is strenuously insisted that the seventeenth and eighteenth items constitute trustees to turn the money over annually to the mayors of Martinshohe and Holton, to be by them used for the relief and assistance of the poor, and that this creates trustees of the mayors of the two places, and the use of the term "mayor" is descriptio personæ, and so the mayors for the time being take the whole interest in trust for the

uses indicated. This might be true under the holding in Inglis v. Sailors' Snug Harbor, 3 Pet., 99, 7 L. Ed. 617, and similar cases, were it not that in each case the direction is, not only to turn over the profits of the bequest to the mayor of the town named, but to turn it over annually to the mayor of the town named. It would therefore be no defense in any year, if the mayor of the town in question should claim his annual payment, for the trustee to say that he had turned it over to some ex-mayor of 10 years before. If any part of appellants' contention in this regard is true, the subordinate trusts are annual in duration, and as many are created as there may be years in which the principal trust exists.

It is contended that, because no part of the money bequeathed goes to the charities, they are not charitable bequests. The earnings of the bequests go to the charities, and that is sufficient to stamp the character of charitable bequests upon the principal.

It is claimed that under the Constitution and laws of Kansas that state cannot provide for the poor of a city except through the county. Nearly every state by Constitution or statute prohibits the imposition of taxes for the support of churches, and yet generally it is regarded as a proper charity for a testator to give his property for the support even of sectarian churches. It is no part of the power of one by will to turn his property over for the support of a public charity, that the charity is one to which the state could contribute its support.

The decree of the District Court is right, and is affirmed.