MARGARET T. MINTURN ET AL., RESPONDENTS, v. CONCEPTION ABBEY ET AL., APPELLANTS.—61 S. W. (2d) 352.

Kansas City Court of Appeals, May 22, 1933.

1180

*A. F. Harvey* and *Randolph & Randolph* for respondents.

*Cook & Cummins* and *John D. McNeely* for appellants.

BLAND, J.—This is a will contest. There was a verdict and judgment that the paper writing purporting to be the will of deceased was not, in fact, his will. The defendant, Conception Abbey, (hereinafter called the Abbey), has appealed.

The plaintiffs and the defendant, Minnie Brown, executrix, together with one Dorothy Martin, who is not a party, are the surviving children of one John Shaw, who died on February 21, 1930. The Abbey is an incorporated religious and educational institution located at Conception, in Nodaway County.

The petition, in substance, alleges that the testator did not have the mental capacity to make a valid will and that he was unduly

influenced in the making of the one in suit by the Abbey, its officers, agents and servants.

The will was executed by testator on September 6, 1929. After providing for the payment of the debts of testator and an "Oblate Monument" for his grave to cost $55, the will provides:

"THIRD: I have heretofore given to my beloved daughter, Cora Corcoran, now deceased, and to her children, and to my children, Anna Allen, William J. Shaw, Agnes Seck, Margaret Minturn, Dorothy Martin and Minnie Brown, substantial sums, and I hereby give to them or their heirs, nothing by this will.

"FOURTH: I hereby give, devise and bequeath all the rest, residue and remainder of my property, of whatsoever kind and character, and wheresoever the same may be situate, to the Conception Abbey, Conception, Nodaway County, Missouri, for pious use for myself, my deceased wife and my deceased daughters, Cora Corcoran, Ida and Agatha Shaw."

It is admitted that the words "for pious use" appearing in the will, mean for the purpose of having said or held, masses of the Catholic Church.

The estate of deceased consisted of approximately $3100 on deposit in the Bank at Maryville, together with what defendants claim to be a loan of $4000, which testator had made to the Abbey, in November 1929, or earlier in that year. Deceased had no lands or chattels at the time of his death.

The testator, John Shaw, at the time of his death, was a retired farmer. About forty-nine years before his demise he moved from Holt County to Nodaway County and lived there on his farm near Conception. He remained on the farm until about twenty-five or thirty years before his death, when, his wife having died and all of his children, except his two youngest daughters, age thirteen years, having married or left, he retired as a farmer and moved, with the two youngest daughters, to the village of Conception, living about two blocks from the Monastery or Abbey. His two youngest daughters kept house and attended the Convent in the nearby town of Clyde and the Parochial School at Conception. About six years after they removed to Conception one of the two daughters, Agnes, who had remained at home, married one George J. Seck, and thereafter lived in Kansas City. The other daughter, Agatha, continued to keep house for deceased for eight or nine years when she went west for her health and died six or eight years before the death of her father. After Agatha left, the testator continued to live alone in Conception until October, 1925, when he entered St. Francis Hospital at Maryville, the County Seat of Nodaway County, and lived there until the latter part of November, 1929. At the last mentioned date testator was adjudged insane on the application of his daughter,

Margaret Minturn and her husband, and she was appointed his guardian. Thereafter the Minturns took him to their home in Kansas City, where he died on February 21, 1930, at the age of eighty-seven years. During his lifetime testator's daughters invited testator to live with them, but he declined because he was afraid he would not be close enough to a Catholic Church were he living with any of them.

Testator was of an independent disposition, thrifty and industrious and accumulated quite a large amount of land. When he moved to Nodaway County he bought a 160 acre farm. About eight years later he purchased 214 acres more and four or five years after that he bought another sixty acres. About the year 1900, when he retired and moved into Conception, he sold the 160 acre farm. About three years later he sold the 240 acres and gave the sixty acre farm to his daughter, Mrs. Cora Corcoran, who died prior to the death of testator. He handled his money to good advantage and, in about the year 1922, he was known to have about $23,000 or $24,000 invested in interest bearing certificates and in United States Government Bonds. During the last years of his life, and before making his last will, he distributed among his children "something like" $50,000.

At the time of making his will the deceased members of testator's family were his wife and his daughters, Cora Corcoran and Ida and Agatha Shaw, all of whose names are mentioned in the will, as well as those of his surviving children. The children who survived him are as follows: William J. Shaw, an only son, who left home when he was twenty-one years of age, and who has been a resident of the state of California for the last twenty-nine years; Anna Allen, of Conception Junction; Agnes Seck, of Kansas City, who married in 1906, and thereafter lived in Kansas City; Margaret Minturn, who left her father's home, according to her testimony, "twenty years or more ago," and who since then has lived in Kansas City; Minnie Brown, who lived in Kansas City for about thirty-eight years prior to the death of her father, and Dorothy Martin of Binghampton, New York, whose testimony was not produced at the trial and who is not a party to this suit.

In the year of 1925, the testator purchased bonds and certificates, the proceeds of which he proposed to give to his children. He had these securities made out to himself and to each individual child or the survivor (himself or the child) and delivered them to the proper child. Most of the children were given $3000 each, in bonds or certificates which became due three years after their date, or in 1928. When due he caused his banker at Maryville to procure the proceeds from the Government and deliver them to his children. The bonds and certificates in favor of some of the children did not amount to as much as $3000 and, when, in 1928, according to his

banker, who was a witness for contestants, testator told him that "he was making a division of his property among his children," testator made up the difference between the amount of the bonds and the certificates and the $3000, except in the case of Mrs. Seck, whom testator told he could not give the necessary $500 to equalize her gift on account of the fact that he did not have the money.

When he paid this money to his daughters each signed a receipt for the same. The receipt signed by Minnie T. Brown, recites:

"St. Francis Hospital, Sep. 23, '28. This is to certify that I have received Three Thousand Dollars from my father's estate, the same being my Amt. in full."

The receipt signed by Anna Allen is in the exact language as that of the Minnie Brown receipt, except that it ends up "the Amnt. of my dower in full." The receipt of Mrs. Minturn closes with the words: "the same being my part of the estate in full."

Each of these daughters attempted to explain these receipts by saying, in effect, that she understood that she was giving the receipt in connection with receiving the amount of the bonds and certificates that we have mentioned and that she did not consider it a receipt for her share of the estate at testator's death. Mrs. Allen admitted that, previously, testator had given her $2000, or in other words that she received $5000 in all. Mrs. Seck admitted that testator had previously given her $1900 and that she has received $4400 in all. Mrs. Brown admitted that she had previously received $1500 or $4500 in all. Mrs. Minturn admitted that she had previously received enough to bring the total up to $4500, and William J. Shaw admitted that he had received $5000 from his father prior to the year 1920. Dorothy Martin, another living daughter, as already stated, did not testify, but her receipt for $3000 appears in the abstract.

Previous to making his last will, testator made three other wills. One on January 29, 1921, one on October 26, 1925 and one on January 4, 1926. The latter two wills, which were executed at Maryville, were drawn up by his attorney there. There is no evidence as to who drew the first will. It was executed at Conception. The first will gave $1 to each of his living children; $100 to Conception Abbey; $500 to the Pastor of the Parish Church at Conception to be used for testator's burial expenses, an "Oblate Monument" at his grave and to care for the graves of himself and wife in the cemetery of the Church at Conception, the balance of the $500 was to go to the Catholic Orphanage at Nevada, Missouri; $700 to the Society for the Propagation of the Faith, New York City, "to be used for Mission purposes;" $700 to a Catholic Seminary to be chosen by the Pastor of the Conception Church, "to be used for the education of Catholic Priests." The rest of his estate was devised to his living children in equal shares, in which the children of the deceased

1184

daughter, Cora Corcoran, should not share. The Pastor of the Parish Church at Conception was made executor of the will.

The second will, dated October 26, 1925, devised $700 to Kenrick Seminary, St. Louis Missouri; $100 to Conception Abbey, "for pious use;" $3000 in Liberty Bonds, Government Savings Certificates and Certificates of Deposit, to each of his living children, except Agnes Seck, who was to receive $2500 in Liberty Bonds. This will recited that these various certificates had been made payable to the individual devisee and the testator, or the survivor. It further gave to his daughter, Anna Allen, all of his household goods and personal effects. The balance of the estate was divided equally among his living children. This will recited that he was leaving nothing to his grandchildren, or the children of Cora Corcoran, because he had already given them "all their undivided portion of my estate or the portion that would have been coming to their mother, Cora Corcoran had she been living."

The will dated January 4, 1926, gave $100 to the Kenrick Seminary, St. Louis, Missouri, "for the education of worthy young men to the priesthood for the St. Joseph, Missouri, Diocese;" $25 to Conception Abbey "for pious use" and $25 for the upkeep of testator's grave; $250 to the Rector of Clyde Parish, at Clyde "for pious uses;" $25 to the Rev. Father Gregory, Conception, "for pious uses for deceased Oblates." This will directed that an Oblate monument be placed at testator's grave. It gave $25 to the Rector of the Church at Conception Junction "for pious uses." The will further devised $3000 in Government Bonds and certificates and Government Savings Certificates to each of his living children, except to Agnes Seck, who was to receive $2500 of these securities and $500 in cash. This will recited that these certificates had been made payable to the individual devisee and to the testator or the survivor. In fact, there is no substantial change in the will dated January 4, 1926, from that of October 26, 1925, except in relation to the devisees other than testator's children, and the devise to Mrs. Seck, which was increased by $500 in the latter will.

Conception Abbey is located at Conception. It is an incorporated religious institution and is composed of priests of the Benedictine Order of the Catholic Church. Its buildings at Conception are known as the "Monastery" and the members of the order as priests or monks.

The evidence shows that the Benedictine Order is a very austere one; that the Abbey at Conception was established many years ago; that services of the Order are held daily, beginning at a very early hour in the morning (about five o'clock) and continuing at intervals throughout the day; that the Abbot is the head of the Monastery and that he furnishes priests from the Monastery to various Catholic

Churches in the vicinity and a Chaplain for St. Francis Hospital at Maryville, which is an incorporated institution, operated by Catholic Nuns or Sisters. There is no connection between the two corporations, except that the Abbot at the Monastery is the religious superior of the Sisters in the Hospital, but not the patients therein. The Monastery or Abbey or members thereof has no temporal or business relation with, or authority over, the hospital or the Sisters therein, but as before stated, the connection is purely religious.

The evidence further shows that there is a Parish Church at Conception for which the Abbot furnishes a Pastor. However, this church is a part of the Monastery, itself, that is, the church building serves as a church for the priests and students of the Monastery, as well as the parishioners of Conception Church.

The evidence further shows that John Shaw was always a devout Catholic; that his family was reared in, and are still, members of that Faith; that after the death of his wife, when he moved into the village of Conception with his two youngest daughters, he devoted his time to a small garden about his home and to attending church at the Abbey.

The evidence shows that after testator moved to Conception he became even a more devout Catholic than formerly; that while living in Conception, and prior to going to the hospital at Maryville, he would arise at four o'clock in the morning, attend mass at five and again at six, come home, get breakfast and go back at eight; that he would attend Rosary in the afternoon and Benediction, when there was such, so that he would spend about half of his time in Church, according to his son, who testified for the contestants. This son also testified that after testator moved to Conception the latter had nothing to do but attend to his garden and go to church.

The evidence further shows that for about fifteen years before his death testator was a member of the Oblate Society of the Monastery; that this is a spiritual organization composed of friends of the Society, a brotherhood or fraternity; that the members of the Society receive instructions at the Abbey once a month and have their own library; that the testator was assistant or secretary to the head of the Oblate Society or the Prior of the Abbey (the latter being next highest in authority to the Abbot); that it was testator's duty, when any new member was being received, to assist at the ceremony and that, when one died, to gather small contributions from the other members and have masses said for the deceased members. The Prior testified that testator often told him "I am an old man and I want to make my peace with God."

As before stated, the Abbot is the head of the priests at the Monastery or Abbey. All the property of the Order is held in the name of the Order and no individual member owns anything whatever,

but he is supported and cared for out of the common treasury. If any individual receives any property or estate it is turned over to the Order.

The evidence further shows that it is the teaching of the Catholic Religion that the prayers of the living avail for the dead; that these masses, according to the Catholic belief, are repetitions of the Lord's Last Supper with accompanying prayers.

The evidence on the part of the contestants of the will tends to show that during the last few years, before testator moved to the hospital at Maryville, his memory became bad; that he complained of a roaring in his head and that he grew feeble. The evidence further shows that after he went to the hospital it was found that he was suffering from Bright's disease, uræmic poisoning and hardening of the arteries; that he was confined to his room at the hospital a part of the time, and that he was able to attend to his business matters with the assistance of his banker.

The evidence shows that, during the last two years of testator's stay at the hospital, the Abbey had furnished to the hospital a Chaplain by the name of Father Pius; that the testator attended mass said by Father Pius every morning when the former was not ill; that he did not miss services in the Chapel in the hospital, which were at six o'clock in the morning, more than twenty times in the four years that he was there; that Father Pius had charge of the Chapel and lived at the hospital; that he was a man of very attractive personality; that he and testator were very friendly; that some days the former would come into the latter's room and *vice versa;* that they would visit back and forth.

The evidence further shows that during the time testator was in the hospital his daughters and son would visit him periodically, some of them coming about every six months. His daughter, Anna Allen, who lived near Conception on a farm, would come oftener. The son testified that he saw the testator four or five times in the last fifteen years of the life of the latter; that he saw him in 1924 and again in the latter part of 1929, but did not come to the funeral.

Testator's children, who testified in the case, stated that, in 1928, when they would visit their father he would cry, was nervous and complained that he had no money; that testator would cry over money matters; that "he was afraid that somebody was going to get it (his money) away from him;" that he would complain that he "didn't have any money;" that "his money was all gone," and that the Sisters and the Abbey had gotten his money.

Mrs. Seck testified that: "Well, when he was telling me about that $4000 that the Monastery had gotten, I asked him, I said, 'What did you give that money to the Monastery for?' And he said, 'Well' he said, 'they are giving me four per cent,' and he said, 'the banks

will only give me two per cent.' I said, 'Well anybody will give you six per cent,' I said, 'That Monastery is just beating you,' I said, 'Anyone can give—will give you six per cent.' He said, 'Well, they have only got that money for a year,' he said, 'and when that year is up in November, I will get that money back,' he said, 'and I will pay you all the five hundred dollars that would help to make up that bond.'" However, she stated, that she never asked him about the $500 which was the necessary sum to make up and equalize the difference between the amount of the gifts of bonds and certificates he had given her and the other children. She further testified that, "Well last year, he cried every time I saw him continually. Q. What would he talk about as the reason for his crying, what did you ascertain— A. Money, because he had given his money away. It worried him till the day he died; that was the last worries till the day he died, he worried about his money." The evidence further shows that at the time testator complained that he had no money, he had at least $3000 in the bank and in order to appease him his children would give him small sums of money and pay some of his bills when he thought he had no money.

There was evidence on the part of the contestants that their father was very feeble during the last year of his life; that they could hardly get him into their automobiles to take him up town on account of his weakness; that his memory was bad and that he could not remember how much he had in the bank; that he had $2000 on deposit in a special account in the bank and something over $700 in a general deposit; that he could not understand, when he received his bank statement showing the $700 general deposit, why it was not more. The evidence of William Shaw shows that testator knew that he had the $2000 in the bank, but merely that he could not understand the report that the bank gave him.

One James Brady, testifying on behalf of contestants stated that he lived near Maryville and had been acquainted with testator for many years before the latter's death; that one of the daughters of the witness was operated upon at St. Francis Hospital and that he saw testator several times in September, 1929; that at that time he found that testator had failed physically and seemed more feeble; that he would "slump down into his chair" and "he never got up out of his chair while I talked to him;" that he never saw testator cry; that he had the following conversation with testator:

"Well, I said, 'How are you, Mr. Shaw?' when I went in the room, and he looked up at me and he said, 'I am getting soft.' I didn't understand what he meant, and I said, 'How is that?' He said, 'I am giving away all my money,' he said, 'I gave a thousand dollars before to one of them, and one of them I gave four thousand dollars.' He said, 'When you get soft, that is the time they will work on you.'

I said, 'You should not give it all away,' I said, 'you should keep enough to live on.' He said, 'Well, perhaps I won't live very long;' " that the witness did not notice anything that was not intelligent about the conversation, but testator seemed nervous, but "knew all about everything."

The evidence shows that testator paid his hospital bill promptly every month; that on May 28, 1928, testator gave the hospital $1000 toward the erection of a building, and in 1929, $500 "for the chapel;" that about a year before testator left the hospital, he gave it a check for $1000 as payment of his board in advance; that after he left the balance, covering the amount not earned by the hospital, was returned to Mrs. Minturn, his guardian.

Patrick Shae, testifying for the contestants, stated that he was a cousin of the contestants; that he lived at Clyde near Conception; that he had known the testator practically all the witness' life; that he saw the testator at the hospital in Maryville in the month of June, 1929; that at that time the testator was very weak; that the witness was confined to the hospital himself and that the testator would come to the witness' room and, "I could hear him coming some little time before he got there. He had a cane and I could hear him tapping and shuffling his feet, moving them a little at a time, and then if he would come into the room, he would move them a little that way (illustrating), and maybe stand up for awhile, and maybe sit down. Q. How long steps would he take? A. Looked to me like possibly a foot long, maybe a little longer." He further testified that testator was up and around most of the time.

Joseph Jackson, testifying for the contestants, stated that he was testator's banker and had known him probably twenty years; that testator had a bank account at the witness' bank but the witness could not tell for how long; that he would frequently see testator at the bank and at the hospital; that he transacted part of testator's business and talked to him frequently; that he transacted the business of "settling up some matters between him and his family, his children, disposing of some money that he gave them. Then I transacted some business for him in connection with some securities, bonds that he had." The witness described the bonds that testator had made out to himself and his children or the survivor and testified that the witness would have the children and the testator sign the bonds and the witness would convert them into cash at maturity; that in the year of 1928 or 1929, prior to September, 1929, testator "told me he was making a division of his property among his children, and that was all in connection with these bonds."

"Q. Now on occasions, what I am referring to is whether or not you were called upon by him what accounts he had and what funds he had? A. Oh, yes, yes, he would get confused on that, I have been

called down there when Mr. Shaw would ask me how much money he had in the bank, and I would tell him and explain to .him, and he was a little hard to understand me, and would say so. He would say he didn't understand this thing or that, and the other that I was telling.

"Q. Now, what would you be telling that he didn't understand? A. Well, he didn't seem to comprehend figures or transactions of business. If I would tell him that he had $1500 in the bank, and that he had sent Mrs. Brown at Kansas City a $1000, he just didn't seem to understand that he had sent any money out or whether this $1500 was all the money that he had or not. I know that he had what he called a special account there at the bank. One time he had a time certificate, I think the amount of it was three or four thousand dollars—that might have been bonds—but anyway he had $3,000, as I remember it, and he didn't want to get that in his general checking account; for some reason, he wanted to keep that in a separate place; he didn't want it in a certificate, and I suggested to him the idea that he put that in what we would call the John Shaw special account, and I put it there, and marked it special, and I put it there and that was separate and aside to his general checking account. And I had no more done that until he lost track of it. He couldn't understand how he had that special $3,000 in his special account, and it didn't show up in his regular account, and I recall writing it out, making a memoranda in writing."

The witness further testified that it was his opinion that testator did not "altogether" comprehend or realize what money he had, where it was, or how much there was; that testator told him that he feared that he would become dependent upon someone; that someone was wanting his money. The witness did not testify as to whom this someone was. The witness testified that he did not believe that in the first part of September, 1929, testator "knew and realized what money, time certificates, and special deposits and property that he did have."

Several witnesses who testified on behalf of the Abbey stated that they had known testator for many years, living near him; that they had seen him in the hospital and testified to a state of facts tending to show that his mind was clear and that he had ample mental capacity to make a will.

One of the Sisters at the Hospital testified as to his having a sound mind and memory and stated:

"I have noticed that when some of his people would come, he would say, now, they are just after what little he had left, and he gave them what he wanted them to have, and the rest he had went as he pleased. Then he would cry and fret around for a week or two, and after he would forget that, he would be all right again,

but this is the only time I would ever see him fret and cry;" that when his children would leave testator would say that they wanted what little was left and that they had received all that was coming to them.

The hospital physician testified that he saw testator in a professional way frequently and that "I believe his mind was clear as any man of his age that I have ever known."

Witnesses on both sides gave their opinion as to testator's mental capacity at or about the time he executed the will in controversy, contestants' witnesses stating, in effect, that it was their opinion that he did not have sufficient mental capacity to make a will and appellant's witnesses to the contrary. Defendant, Minnie Brown, was made such on account of being executrix of the will. She, however, testified in favor of the contestants. Father Pius did not testify. The testimony shows that at the time of the trial he was a man over eighty years of age and was confined to the infirmary in the hospital at the Abbey.

The circumstances surrounding the execution of the contested will are as follows:

Mr. Cummins, a lawyer in Maryville, testified that some one, he could not recall whom, called him and asked him to come to the hospital, that Mr. Shaw wanted to see him; that he thereupon went to the hospital and found the testator desired to make a will; that he took a notation of what the testator wanted in the will and returned to his office, drew up the will as testator desired and then went to the hospital with the witness' stenographer; that testator then read over the will and signed it in the presence of Mr. Cummins and the stenographer, as witnesses. Both of these persons testified that they were of the opinion that testator was of a sound and disposing mind at the time he signed the will. There was no one present during either of the visits of Mr. Cummins to the hospital, except the testator and Mr. Cummins on the first visit and these two and the stenographer on the second visit when the will was signed.

Appellant insists that the court erred in refusing to give its instruction in the nature of a demurrer to the evidence for the reason that there is no evidence of a sufficient lack of mental capacity of the testator to make the will in contest. In this connection, appellant, among other cases, cites that of Berkemeier v. Reller, 317 Mo. 614, 644, where the court said:

"It has been stated by this court many . times that imperfect memory resulting from sickness or old age, forgetfulness of names of persons, the repetition of questions, and eccentricities in dress and oddities of habit are not evidence of such mental disease as renders a person incapable of making a will, when these things are not accompanied by proof of facts and of acts showing that the person is

incapable of understanding the ordinary affairs of life, of transacting his ordinary business, understanding the extent of his property, and appreciating those who would be the natural objects of his bounty.''

While it is true, that sickness, old age and mere eccentricities, in general, are not sufficient, in themselves, to overthrow a will on the ground of mental incapacity, nevertheless, each one of these may be taken into consideration with other facts in determining whether the testator is of such mental capacity. [Huls v. Lawrence, 300 S. W. 1004, 1014, 1015, and cases therein cited.] As was stated in 28 R. C. L., p. 94:

''Mere old age, physical weakness and infirmity or disease or even extreme distress and debility of the body, are not necessarily inconsistent with testamentary capacity, but such facts are admissible in evidence to aid the jury in determining whether or not the testator had sufficient testamentary capacity at the time of making his will.''

The rules of law applicable to the case are well settled. It is merely a question of applying the rules to the facts.

In passing upon the question of the demurrer to the evidence, of course, we must take all of the evidence and all reasonable inferences that may be drawn therefrom, in favor of the respondents, contestants. This does not mean that the jury are entitled to make a will for the testator by setting aside the one made by him on the ground that they disapprove of the manner in which he disposed of his property, or that they, had they been in testator's place, would have chosen his heirs as the objects of his bounty. A man who has the mental capacity to make a will has the right to choose any one he desires as his beneficiary, without that right being questioned by any court or jury.

The fact that the testator gave what he had left for the purpose of having masses said for the dead does not, in our opinion, indicate that he was depriving those who would naturally be the beneficiaries of his bounty, to-wit, his children, of their inheritance in an unusual way, for the reason that, only a short time before, he had divided the main part of his estate between his children, and the will recites that he had theretofore given his children and grandchildren ''substantial sums, and I hereby give to them or their heirs nothing by this will.'' We, therefore, do not think that the rule that an unnatural or unjust disposition made by a testator of his estate is evidence tending to throw light on his testamentary capacity, has any application to the facts in the case at bar. On the contrary, the contents of his wills of 1925 and 1926, made when his testamentary capacity cannot be questioned, showing his intention to leave his children approximately $3000 each, in addition to that he had already given them, together with the fact that after making these wills,

he gave the property mentioned therein to them and then made the will in contest reciting what he had done and stating, in effect, that he wanted the balance of his property to go for masses for his dead, shows an original intent as to what he wanted his children to have followed by a course, persisted in a logical and intelligent way to the end, in carrying out that intention. The will finally made indicates, unmistakably, that the testator in making it felt that he had done by his living children and grandchildren all that a parent should be called upon to do and that he then intended to take care of the needs of his dead, mentioning them all by name, and his own needs, in the life hereafter. In view of his intense religious convictions it is not surprising to find his will drawn as it is. It is for this reason that the case becomes an extremely close one on the question of testator's testamentary capacity and it is only because there is some evidence that he did not know of the extent of his property that we are willing to say the case should have gone to the jury.

The facts taken in their most favorable light to the respondents tend to show that the testator, at the time he made the contested will, was a feeble old man and that he was unable to properly comprehend the extent of the property that he owned at that time, to-wit: The money which he had on deposit in the bank at Maryville.

The amount that testator left to the Abbey for the purpose of saying masses was a substantial one and consisted of all of his remaining property. While he had long before expressed an intention to one of his daughters to leave to the Abbey money for the purpose of having masses said for his dead, and manifested that intention in former wills, executed at a time when there can be no question of his testamentary capacity, he did not indicate an intention of leaving as much as $7000 for that purpose.

While the Abbey insists that it did not receive the $4000 from the testator as a loan and, therefore, his estate amounts to only approximately $3100, there was evidence from which the jury could say that the $4000 in question was a loan at interest, therefore, we must view the matter as though an amount of approximately $7000 was left to the Abbey in trust "for pious use." If the testator had known of the extent of his property he may not have desired to give that sum of money for that purpose. We do not recite this fact for the purpose of indicating that such an amount of money left for this purpose *in all cases* is excessive enough to consider it as having a bearing upon the question of testamentary capacity. But the fact that the testator in this case left this amount of money, which was everything he had, together with the fact that the evidence shows that he did not realize the extent of the money that he had, and the further fact of his feebleness, was for the jury to consider in judging of his capacity to make the will.

One of the elements of testamentary capacity is an understanding on the part of the testator of the extent of his property. According to the evidence, at times near the date of the making of the contested will, he was under the belief that he had no money and manifested a feebleness of body, if not mind, by crying over the matter. According to the testimony of his banker, he could not have had a clear understanding of the extent of his property. We think that, under all of the circumstances, it was a question for the jury as to testator's mental capacity to make the will in question.

We do not wish it understood that, in this connection, we have given any consideration to the fact that testator was a very religious man and attended religious services to an extent that might seem unreasonable to some. A suggestion is made, on the part of the contestants, that the time he devoted to religion, together with the amount of his gifts during his lifetime for charitable and religious purposes, is some indication of mental failure.

The evidence shows that the testator was always a religious man and became more so after his children left home and he retired and moved to Conception. This increase in religious feeling on his part, the evidence shows, was natural, in that he retired and had nothing to do but attend to his garden and go to church. The fact that he moved into this religious community, consisting of the Monastery and the little village of Conception, surrounding it, shows that thirty years prior to his death he had determined to devote his future life to matters having to do with the hereafter. This move on his part occurred about thirty years prior to his death and there is no contention that he was mentally unsound at that time. In fact those of his children, who are the contestants, admitted that they were of the opinion that his mental condition was good at the time he gave them the various sums of money that they admitted they had received. Some of this money was received as late as 1928. It has often been held that mere religious fervor or beliefs, regardless of the character of the religion, is not evidence of mental incapacity. [Spencer v. Spencer, 221 S. W. 58; Fulbright v. Perry County, 145 Mo. 432, 435, 436, 444; In re Powell Estate (Iowa), 26 L. R. A. (N. S.) 479, 481.]

The history of the Christian religion includes many martyrs who gave up their lives for their religion and many others, such as members of the Benedictine Order who conduct Conception Abbey, who have given up all worldly things and contact in order to devote their entire lives to religion (which in this case includes the education of youth.) In fact many missionaries, of all religious denominations, have gone to foreign countries to dwell in great privation, leaving behind their homes and friends. It would be going to ex-

tremes, indeed, to say that the religious fervor of this old man, who had nothing to do but contemplate the hereafter and to "make his peace with God," indicated, in any respect, an unsound mind.

The appellant offered, but the court refused, an instruction withdrawing from the consideration of the jury the question of undue influence, which act of the court the appellant assigns as error. We think, undoubtedly that this instruction should have been given, as there is no substantial evidence of undue influence shown by the record in this case.

While it is true that undue influence may be shown by circumstantial evidence, "evidence to establish undue influence whether direct or circumstantial, must be of such a nature and character as to amount to over-persuasion, coercion or force to the extent of destroying the free agency or will power" of the testator. [Bushman v. Barlow, 316 Mo. 916, 942.] "The proof of influence alone is not sufficient. It must be *undue*." [Turner v. Anderson, 236 Mo. 523, 541.] "Mere passion and prejudice, the influence of peculiar religious or secular training, imbibed in the natural course of one's experience and contact with society, cannot be set up as undue to defeat a will." [28 R. C. L. 138.]

"To sustain this issue (undue influence) it was necessary to show that the proponent by persuasion, suggestion, importunity or other device or machination, controlled, directed, restrained or overcame her power of judgment as to the true relation between herself and those who were the natural objects of her bounty in the execution of her will." [Bushman v. Barlow, supra, l. c. 939.]

There is no evidence that any priest connected with the Abbey had anything to do with the making of the will. The undisputed testimony shows that it was drawn by a reputable lawyer of Maryville at the solicitation of the testator, himself, and that no one was present either when the information to be contained in the will was given to the attorney or when it was executed, except the testator, the attorney and the stenographer who witnessed it.

There is testimony in the record that a very friendly feeling existed not only between the testator and the priest of the Abbey but between him and the sisters at the hospital where he lived for four years prior to his death. However, there was no connection whatever between the hospital and the Abbey. They were two separate corporations and did not own any property in common or have any business relations whatever with each other, the only relationship being that the Abbot of the Abbey furnished the priest for the hospital who resided in there and that the only contact with the hospital was of a spiritual nature, having nothing to do with any property that could possibly be disposed of by a will. There is no allegation in the petition, or evidence to the effect, that there was a conspiracy or

concerted action between any of the Sisters or any of the priests of the Abbey to obtain the property of the testator for their institutions, either during his lifetime, or by will.

So in discussing this feature of the case it would not be proper for us to take into consideration any gifts that the testator gave to the hospital. We have quoted from testimony, found in the record, consisting of declarations made by the testator to some of the witnesses for contestants to the effect that the hospital and the Abbey had over-persuaded him in the way of making gifts to them. As before stated, any testimony of gifts to the hospital would not be evidence tending to show influence that the members of the Abbey might have used upon the testator to procure gifts for it, during his lifetime, or by means of a will. We may say that the time with reference to the making of the will in which these declarations were made is not shown in the testimony. The evidence does not show that they were made even a short time before or after the making of the will. However, it makes no difference when they were made if not made at the time the will was executed.

The evidence of these declarations on the part of the testator was objected to, but the court admitted them on the theory that they tended to show the testator's mental condition. They were admissible for such purpose if they were "so connected with the making of the will in point of time as to furnish reasonable grounds of judgment in reference to the testator's mental condition at that time." [Walton v. Kendrick, 122 Mo. 504, 518.] But they were not admissible as declarations to establish the substantive fact of undue influence and afford no substantive proof of such, being merely hearsay. [Schierbaum v. Schemme, 157 Mo. 1, 16.] In any event, declarations of a testator are always taken with great caution. As was said in Webster v. Leiman, 44 S. W. (2d) 40, 46.

"If wills could be set aside on what some witnesses claimed the testator told them, absent other evidence, either directly or through presumption, tending to show the exercise of undue influence, no one could die with any reasonable expectation that his wishes, as expressed in his will, would be carried out."

Even if there were solicitations on the part of the members of the Abbey for gifts from the testator during his lifetime (and there is no evidence competent to so show), there is no evidence that they solicited him to make a will in their favor. In fact, as we will hereinafter point out, he did not make his will in their favor or in favor of the Abbey, but even if it had been shown that they did solicit him for gifts, it is well stated in 28 R. C. L. 140:

"Moderate and reasonable solicitation and entreaty, though yielded to, if done intelligently and from a conviction of duty, will not vitiate a will in other respects valid, and it has even been said that

solicitations, however, importunate, cannot themselves constitute undue influence.''

Of course, requests and urgings may be so persistently made that they may go beyond fair limitations, but they must be of such character as to overcome testator's will power and substitute that of the beneficiary for that of the testator.

The fact that a testator gives all of his property to strangers, rather than to near relatives, such as his children, is sometimes taken into consideration, with other facts, in order to determine if there is any undue influence present. The mere fact that testator has pursued such a course and thereby the provisions of his will are harsh and unjust and the natural objects of his bounty receive less under the will than if he had died intestate, are not circumstances sufficient, within themselves, to show undue influence on the part of the beneficiary even though he may be a stranger to the blood. [Kleinlein v. Krauss, 209 S. W. 933, 936.] However, there is no evidence in this case of any discrimination against the heirs of the testator, who are his children. As before stated, he distributed most of his property among them before he died and while they testified that they did not understand that what they received was all they were to get from the estate, although they signed receipts, which upon their face, would seem to show to the contrary, the undisputed facts, in this connection, establish that they received substantial sums from him within a year or so prior to the time he made his will, all as he had theretofore planned, as shown by prior wills, and that he had this in mind when the contested will was executed, as indicated by it.

While contestants contend that the $4000 transaction between testator and the Abbey was a loan we also understand them to say that the loan was not grounded on good business principles and that it would not have been made had testator not been unduly influenced, there is no evidence competent to show that he was influenced a particle in making this loan and there is no evidence that testator did not use good business judgment in making it. From all the evidence the Abbey may be a creditor of the highest standing. Even were the alleged declarations of the testator competent on the substantive fact that he was ''soft'' and that the Abbey, if *it* was what he was talking about, had importuned him to make the loan, they would not, standing alone, show undue influence even in that transaction. [13 C. J. p. 405.] While the fact that a testator's mind is enfeebled is proper to be considered on the question of undue influence, even had the existence of undue influence in another transaction been shown in this case, that showing would not have operated to set aside the will. It is not a question of the existence of undue influence but its operation at the time of the making of the will. [Sunderland v. Hood, 84 Mo. 293.] If it were shown that the Ab-

bey had persisted in a policy of over-persuading this old man to continually make gifts to it, while he was under their domination, then it would have been competent, by proper evidence to show that he had made it a $4000 gift about the time he made the contested will, but that is not this case.

So we have nothing left upon which to base any claim of undue influence except the fact that the relationship between the Abbey and the members thereof, on the one hand and the testator on the other, was that of priests and communicant, and therefore, a relationship of confidence and trust. The appellant denies that such a relationship existed between it or its members and the testator, but for the purposes of this case, we may assume that such relationship did exist. It is insisted by the respondents that such was the relationship and, for that reason the burden of proof shifted to the Abbey to overcome the presumption of undue influence by reason of that relationship and that no evidence was introduced for that purpose.

However, the mere relationship of confidence and trust does not raise any presumption of undue influence. Such "presumption rests upon three facts for its formation: First: the fiduciary relation; second, the gift or devise to, or in the interest of the guardian (beneficiary); third, an opportunity for an exercise of undue influence. . . . . Furthermore, we have held that the mere opportunity of a beneficiary to exert undue influence unsupported by other evidence showing its actual existence does not raise a presumption of undue influence." [Loehr v. Starke et al., 56 S. W. (2d) 772, 777.]

"It is the generally accepted view that the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, and does not place upon the beneficiary the burden of disproving undue influence. Those consequences follow only when the beneficiary has been actively concerned in some way with the preparation or execution of the will." [28 R. C. L. 146, 147.]

Of course, where it is shown that the testator is under the general domination and control of the person charged with unduly influencing him it is not necessary to show that such person was present when the will was made (Rayl v. Golfinopulos, 233 S. W. 1069), but, in any event, it must be shown that such influence, itself, was present and acting upon the mind of the testator at the time.

The presumption of undue influence did not arise in this case because the evidence fails, in two particulars, to meet the requirements laid down in the case of Loehr v. Starke, supra: First: Because there was no gift or devise to the Abbey or the members thereof, and, second: There is no evidence that any member or person connected

with that institution had anything to do with the execution of the will or that testator was under the domination of any such person.

There was no individual bequest to the Abbey. It was made to it "for pious use for myself, my deceased wife and my deceased daughters," etc. As already stated, the evidence shows that the words in the will "for pious use" mean masses to be said for the purposes indicated. Such bequests are universally held, so far as we have been able to find, to be, not individual bequests, but charitable trusts. The nature of a bequest of this kind is fully set forth in the case of Hoeffer v. Clogan (Ill.), 40 L. R. A. 730, 732, as follows:

"It cannot be denied that bequests for the general advancement of the Roman Catholic religion, the support of its forms of worship, or the benefit of its clergy, are charitable, equally with those for the support or propagation of any other form of religious belief or worship. The nature of the mass, like preaching, prayer, the communion and other forms of worship, is well understood. It is intended as a repetition of the sacrifice on the cross, Christ offering Himself again through the hands of the priest, and asking pardon for sinners as He did on the cross; and it is the chief and central act of worship in the Roman Catholic Church. It is a public and external form of worship,—a ceremonial which constitutes a visible action. It may be said for any special purpose, but from a liturgical point of view every mass is practically the same. The Roman Catholic Church believes that Christians who leave this world without having sufficiently expiated their sins are obliged to suffer a temporary penalty in the other, and among the special purposes for which masses may be said is the remission of this penalty. A bequest for which special purpose merely adds a particular remembrance to the mass, and does not, in our opinion, change the character of the religious service, and render it a mere private benefit. While the testator may have a belief that it will benefit his soul or the souls of others doing penance for their sins, it is also a benefit to all others who may attend or participate in it. An act of public worship would certainly not be deprived of that character because it was also a special memorial of some person, or because special prayers should be included in the services for particular people. Memorial services are often held in churches, but they are not less public acts of worship because of their memorial character; and in Duror v. Matteux, supra, the trust for the preaching of an annual sermon in memory of the testator was held to be a charitable use. The mere fact that the bequest was given for the intention of obtaining some benefit, or from some personal motive, does not rob it of its character as charitable. The masses said in the Holy Family Church were public, and the presumption would be that the public would be admitted, the same

as at any other act of worship of any other Christian sect. The bequest is not only for an act of religious worship, but it is an aid to the support of the clergy. Although the money paid is not regarded as a purchase of the mass, yet it is retained by the clergy, and, of course, aids in the maintenance of the priesthood.'' [See also, In re O'Donnell Estate (Pa.), 58 Atl. 120; Morris v. Edwards, 227 N. Y. 141; Burke v. Burke, 259 Ill. 262; Rhymer's Appeal, 93 Pa. 142; Schouler, Petitioner, 134 Mass. 426; Ackerman v. Fichter, 179 Ind. 392; Coleman v. O'Leary's Exr., 114 Ky. 388; Kerrigan v. Tabbe, 39 Atl. 701; Webster v. Sughrow, 69 N. H. 380; In re Kavanaugh Estate, 143 Wis. 90; In re Hamilton Estate, 181 Calif. 758; In re Shanahan's Estate, 92 N. W. 948.] The interest that the Abbey has in the bequest, as trustee, is not sufficient to make it a beneficiary under the will in any substantial sense. [See cases last cited and Ryan v. Rutledge, 187 S. W. 877; Bauer v. Myers, 244 Fed. 902.]

As before stated, there is no evidence that any member or agent of the Abbey had anything to do with the making of the will and, therefore, for this additional reason, no presumption of undue influence arises by reason of the confidential relationship, if any. Of course, we do not mean to say that the beneficiary, itself, must have used the undue influence in order for it to work as a setting aside of a will, but in this case, there is no substantial evidence that anyone exercised such influence in the making of the contested will.

A much stronger set of facts for contestants than exist here was shown in the case of Tibbe v. Kamp, 154 Mo. 545, yet, the Supreme Court reversed outright a judgment founded upon a verdict that testator was unduly influenced. In that case a substantial part of an old man's estate was given to a Lutheran Seminary to the exclusion of an only son of testator to whose business acumen the latter owed whatever he had at his death and with whom the testator was upon the friendliest of relations. A Lutheran minister interested religiously in the seminary was testator's pastor, confident and adviser. Testator had made the minister many personal gifts, as well as for Lutheran charities, during testator's lifetime and the minister had much to do with the making of the will in favor of the seminary. The making of the will was kept a secret from the son. A reading of that case discloses that there must be something substantial upon which to base a charge of undue influence.

From what we have said the court should have given appellant's instruction withdrawing the question of undue influence from the consideration of the jury and, because of this error, the judgment is reversed and the cause remanded. All concur.