**In re LANGILLE'S WILL.**

County Judge's Court, Pinellas County.

December 9, 1954.

Harris, Barrett, McGlothlin & Dew, St. Petersburg, for proponents.

Robert S. Baynard and L. D. Martin, both of St. Petersburg, John H. Sherman, Boston, Mass., for contestant.

JACK F. WHITE, County Judge.

This is a suit on petition of Gordon O. Langille, a resident of Massachusetts, to revoke the probate of a testamentary writing executed by his father, Dan Langille, who died a resident of St. Petersburg, Florida. The answering respondents are Union Trust Company of St. Petersburg, to whom letters testamentary issued, Alma L. Gordon, daughter of the decedent, and Lynn Hospital of Lynn, Massachusetts. The import of the pleadings and evidence will be set forth as the decision unfolds. All motions and objections on which rulings are not indicated in the record are denied and overruled. The petitioner may be designated as contestant and the respondents as proponents.

On August 12th, 1948 in St. Petersburg, Florida, Dan Langille, 87 years of age, executed what purported to be his last will and testament. This was soon after the death of his second wife, Gertrude Langille, and his only heirs presumptive were an unmarried son, Gordon O. Langille, and Alma L. Gordon, a married daughter, children by his first wife, Georgena Twicke Langille, who died in 1911.

Dan Langille left an estate appraised at $269,360.48. To his son, Gordon O. Langille, an indigent welfare dependent of the state of Massachusetts, Dan Langille bequeathed the interest on $1,000 and to his daughter, Alma Langille Gordon, a housewife and mother residing in Lynn, Massachusetts, he bequeathed $1,000 a year. There were bequests of $2,000 each to a sister and two sisters-in-law in California, New Hampshire and Nova Scotia, and

bequests to a local lodge and home of the Independent Order of Odd Fellows located respectively at Lynn and Worcester, Massachusetts, aggregating $10,000, a bequest to Lynn Hospital of $10,000 and a bequest to Lynnfield Street Baptist Church of $2,000. The bulk of the estate was bequeathed to Union Trust Company of St. Petersburg in trust mainly for the children of Alma Langille Gordon with ultimate vesting in the beneficiaries upon the youngest attaining the age of 30 years or upon the prior death of Alma L. Gordon. The will offered no explanation of any of the bequests.

Dan Langille died April 12, 1950. The will was admitted to probate and some time thereafter proceedings were begun on petition of Gordon O. Langille, the son, to have the probate set aside and the will decreed wholly or partly invalid on grounds including testamentary incapacity, mistake and undue influence. The respondents denied the essential averments of the petition and challenged the right of the contestant to maintain the suit. Much evidence was adduced and the issues argued and now the court finds, concludes and adjudges as herein set forth.

Dan Langille was born in 1861 and when a young man married his first wife, Georgena Twicke, who became the mother of his children, Gordon and Alma, born respectively in 1888 and 1900. There appears nothing unusual in the family relations during the early childhood of the son and daughter. Dan Langille was interested in religious and fraternal matters in his home city of Lynn, Massachusetts, and was mindful of his domestic and civic obligations—until a fateful development arose during the years 1907-1909.

When his children were about 19 and 7 years of age, Dan Langille left them and their mother, Georgena, and entered into illicit relationship with one Gertrude S. Mess, a married woman. For some time thereafter he visited his children and during the interim effected certain property grants on behalf of his deserted wife, but Georgena declined in health and on February 25th, 1911 died. Whereupon Gertrude S. Mess obtained a divorce by default from her husband, Fred F. Mess, married her paramour, Dan Langille, and became step-mother to his children, Gordon and Alma.

After the death of their mother, the children left their Massachusetts home and went to California to live in the home of a paternal aunt, with the understanding that their father would soon join them there. But Gertrude S. Mess, as stated, divorced her husband and married Dan Langille and Dan's plan to join his children in California did not materialize.

Gertrude Langille, having acquired Dan by process of law, at once confirmed earlier evidences of a selfish and possessive nature. She began to expropriate Dan Langille for herself alone and to dominate and control his life. Her feeling toward her step-children was that of extreme jealous dislike. She intercepted Dan's mail from Gordon, then in California, and proceeded to receive and write all of Dan's correspondence for him. Dan was unable to prevent this practice and it was necessary for the son to correspond with his father through a mutual friend to keep their mail out of Gertrude's hands.

The Langille children returned from California in 1914 and they never afterwards lived together as a family. Alma was shuttled off to a boarding school in Maine and did not go to her father in the summers. She subsequently stopped at her father's residence only briefly until she entered commercial college in the same city.

Gordon Langille was subjected to the particular disfavor of his step-mother. Upon his return from California he worked for his father and made collections on rental property, but he could not stay at the residence. The relationship of employer and employee between father and son aroused in Gertrude Langille a determination to sever this remaining contact between them. She repeatedly criticized Gordon and in one instance, in the absence of his father, she threatened him with an axe. Gordon finally left the employ of his father.

Rentals on the Langille properties were in part deposited in Gertrude's joint account with her husband. She was closely connected with the Langille business affairs and this provided her the opportunity to discredit Gordon in the estimation of his father. While in the presence of father and son, she had been outwardly friendly to Gordon, cloaking her bitter dislike. It was through more subtle means that a complete break might be effected, so it was later after Gordon left his father's employ that an unfounded seed of resentment was implanted in the captive mind of Dan Langille —that Gordon had been short in his accounts. Even so, at first Dan Langille must have rejected the reflection upon his son, for their association had been amicable. On analysis, there is no credible showing that there was any defalcation on the part of Gordon Langille or that any person other than Gertrude Langille was responsible for the accusation.

There is no record of any hostility in the meetings between father and son. Dan Langille never confronted his son with an accusation of dishonesty. They parted on friendly terms and as

late as 1928 Dan contrived to approach Gordon with kindly interest though he was unable to bring himself to the point of helpfulness.

The record discloses no fault of either Gordon or Alma Langille serious enough to justify or excuse the mistreatment and neglect to which they were subjected; nor does there appear in Dan Langille himself an original character deficiency which, of itself, would have produced such result. Notwithstanding the weakness of Dan Langille which permitted the disruption of his home and family, the prime finger of blame for the renunciation of these children in the manner described points indubitably toward Gertrude Langille.

After Gordon left his father's employment he moved to a farm purchased in 1921 with proceeds of his mother's estate. On several occasions Dan visited Gordon. The nation's economy was beginning to tighten. The farming enterprise was not successful and in 1928 Gordon tried to borrow money from his father to save the property from a tax sale. Dan Langille told his son he had no money to lend and shortly thereafter the farm was sold for taxes. It was during this period that Gordon saw his father for what proved to be the last time. Gordon's farm was worth $8,000 in 1928. When it was sold for taxes his brother-in-law bought and resold it without Gordon's knowledge, later giving Gordon a check for $430.

Sick and bewildered, Gordon Langille was a victim of circumstance. His health declined and a developing neurosis became serious. In 1933 after working at odd jobs he was sent on medical authority to Grafton State Hospital where, despite adequate improvement, he remained until 1947 as no member of his family would sign him out according to Massachusetts law pertaining to indigent patients. During this extended period of time Gertrude Langille was constantly with her husband, spending summers in Massachusetts and winters in Florida. She now openly stressed her desire that Gordon would never get out of institutional custody. By making Gordon an unpleasant subject she had created in Dan Langille's mind a subtle resentment which became in time a wall of indifference. She attained this result by falsely asserting that Gordon had been short in his accounts, by exaggerating his minor faults and finally by making Dan feel that his son was incurably insane. As a result, although he knew Gordon was in an institution, Dan Langille made no move to visit him or write him or to inquire concerning him. Gordon made no attempt to contact his father, knowing that his step-mother would intercept his letters

and that he could not breach the barricade erected against him, for Dan Langille regarded Gertrude with a strange and fearful attachment.

In 1947 Gordon Langille effected his own transfer to Bedford Veterans Hospital. He was discharged in 1948 and restored to his civil rights. He believed that his step-mother was still alive and that it would be useless to try to contact his father. He was not notified of his step-mother's death or of his father's death and he was not mentioned in the obituary or funeral notices.

Alma, who had married, saw her brother only twice during a period of twenty years, but there was a substantial difference in their ages and, in view of her own mistreatment and complex childhood following the advent of Gertrude, Alma herself was a victim. She had been almost totally dissociated from her father since she was eleven years of age and there was only a slight renewal of association after Gertrude's death. On the witness stand Alma's appearance and demeanor were good. She and Gordon were simultaneously present before the court and, as the hearings progressed, she seemed kindly disposed toward her brother while Gordon's attitude toward his sister was that of unassumed friendliness. Alma's husband and children, present during much of the hearings, did not testify.

The record discloses in Gordon Langille a kindly, sensible man of good demeanor who had suffered cruel misfortune without becoming embittered. He is pictured in the proponents' brief, however, as a ne'er-do-well unworthy of his father. The record nowhere sustains this conclusion. For example, proponents' witness Bertha Coombs, who attended school with Gordon, suggests a different appraisal of Gordon's person and character. The only statement she had heard uncomplimentary to Gordon was made by Dan Langille himself in the recent year 1948 in response to a question. She testified that she knew nothing against Gordon or his character, that he was a quiet person and seemed all right. Gordon Langille was a good witness. His answers were responsive and truthful. During extended examination, while affirming his conviction that the home of his father and mother had been broken by Gertrude, he displayed no rancour. The court found in Gordon Langille much to commend, little to criticize, nothing to condemn.

Upon Gertrude Langille's death in May 1948 the Langille estate held mainly by the entirety devolved upon Dan Langille, but the die which had been cast over the last forty years of his life was set in somber tones. His contact with the common affairs of life

had been lost and could not be restored. He was abnormally con-centered upon his property, ate grease in lieu of soup, lived nig-gardly, denied himself to no purpose, put up a poor front, yet sold his Massachusetts property for much less than its value. He grew vegetables in his front yard and, in a show of penury, peddled them at the market in exchange for meat. He was greatly concerned for his financial security while possessing $200,000 in government securities and other substantial assets.

Equally notable are the things that Dan Langille did not do, further indicating the complex mold into which his mind had jelled. He was almost a complete negation—no participation in civic affairs, no fraternal or religious association, no charitable or other objective human interests. These and related considerations give peculiar emphasis to his propensity for compounding material wealth. The question recurs why, in the extreme twilight of life, he should have strained to conserve his large estate. He couldn't take it with him and after Gertrude's death there was no one in whom for years he had shown any positive interest. His last previous show of affection was toward his children who during the long ensuing interim did nothing to forfeit that affection, and here the further question arises—whether or not the bequests to Alma and Gordon could have been made by a testator possessing free and normal sensibilities.

There is nothing to show that Dan Langille had any personally conceived animus toward his children. His contacts with them, though rare and repressed, were characterized by underlying warmth and affection. He addressed them in endearing terms. Dan Langille was not a heartless or malicious man, yet his neglect was tantamount to extreme cruelty. He should have known from Georgena's experience the uncertain lot of a dependent wife, yet he left Alma only a trifling token annuity. Skipping over both children with negligible notice, he provided richly if remotely for grandchildren whom he rarely saw and hardly knew except by name, and without reference to need or obligation, made minor bequests to several collateral relatives and benevolent groups—none of which, however, could do serious violence to the memory of Gertrude. He made these generous gestures, although he had evinced no such charitable trait during his long sequestered life with Gertrude the spoiler.

Thus are revealed two significant consequences of Gertrude's death reflected in Dan Langille's will. In relation to objects rela-tively impersonal to Gertrude the will is plainly inconsistent with Dan's behavior pattern during her lifetime. Here her death seemed

a partial release. But the will is quite consistent with respect to those objects which were directly offensive to Gertrude—Dan's children by his first wife, Georgena. Shades of Gertrude! Here her continuing influence entered into the execution of what the record reveals to be the most shocking testamentary writing ever brought to the attention of this court.

Legal procedure favors the proponent in will contests, for after a showing of formal execution the usual burden of a plaintiff devolves upon the contestant. In this case, the proponents, contending the contestant's case to be insufficient, have relied largely on evidentiary presumptions, the avowed competence of Dan Langille and the proposition that a will may be unfair and unreasonable and yet valid.

The presumption of validity is *prima facie* only and of course rebuttable. It imposes upon a contestant the ultimate risk of non-persuasion but otherwise pertains only to the proper order of introduction of evidence. The presumption is not evidence but a rule about evidence, and any court failing to inquire fully to ascertain the entire factual picture of a case assumes the risk of giving the rule an effect not intended by law.

The law in general accords much latitude to the individual in dealing with his property. Eccentricity in itself is not tantamount to testamentary incapacity and a will that appears unreasonable or unfair may not, on such grounds alone, be held invalid. A harsh or unnatural will, however, tends to neutralize favorable presumptions and to invite inquiry which may reveal invalidity on recognized legal grounds. Page on Wills (Lifetime Ed.), secs. 842, 858.

The liberality of the law in relation to the making of wills does not justify the assumption that the testamentary act may be performed arbitrarily as an incident to the assertion of an inherent right. It is not a natural or inherent right but one which may be limited according to state policy without infringing any private right guaranteed by the constitution. For example, Florida law now provides that a parent legally responsible for the support of his dependent minor child may not disinherit such child under certain circumstances. Section 733.20(j), Florida Statutes 1953. This enactment was aimed at abuses of privilege against public interest, the prime illustration of which is found in the mixed family.

Interested observers among welfare authorities and members of the Bar are concerned at what appears to be an increasingly unhealthy inconsistency in the law. A wealthy recently acquired step-

mother, for example, may not be excluded from her deceased husband's estate against her will while his dependent child who came into the world willy-nilly may be excluded arbitrarily and completely—except in Florida as now provided by the statute above cited. It is not intended by these observations to advocate specific legislation for every abuse not clearly covered by general law but to stress the point that the making of a will is a right in the nature of a privilege properly exercised only by a free and comprehending mind.

Counsel have cited relevant authorities to support their respective positions. Ordinarily this is not difficult in litigation involving wills, for in no class of cases is it more apparent that *stare decisis* is a doctrine of guidance rather than rigid limitation. The pronouncements of law on the validity or invalidity of wills as determined from the decedent's subjective state of mind or from extraneous influences are found almost entirely in court decisions, and the variety of factual situations is reflected in the variable language of the opinions. The court in stating a rule may use language seemingly broad enough to embrace matters outside the situation actually presented, or the language may be so restrictive as to imply the exclusion of matters properly includable in the rule. So judicial opinion is to be construed with such limitations as are required by a reference to the facts of the case. Atlantic Coast Line Railroad Company v. City of Lakeland (Fla.), 115 So. 669, 682.

Some decisions affirm simply that testamentary capacity implies that the testator must know in a general way his property, the identity of kin and his obligations toward them, and the effect of the instrument he is about to execute. In many cases the facts are such that this statement would not be questioned as an acceptable comprehensive rule of law. But in other cases the courts have noted that the testator also must be able to form his own plan without prompting and to correlate the various factors with respect to each other. It is believed that all these considerations should be taken into account in determining the issue of testamentary capacity.

The dominant role of Gertrude in the drama of Dan Langille and his will might seem to justify the grounding of this decision squarely on undue influence, and there is respectable authority to sustain such conclusion. The general statement that undue influence must be exercised with the object of procuring a particular will is not an arbitrary rule of law. Page on Wills (Lifetime Ed.), sec. 187. It has been held that a person exercised undue influence

although he was not present when the will was made; that it is not material when the influence was exercised if it was present and operating at the time the will was executed. Minturn v. Conception Abbey (Kan. City Ct. of App.), 61 S.W. 2d 352; Hanna v. Eiche (Ky.), 79 S.W. 2d 950. The influence may be that of a third person; and the influence may be entirely unknown to the beneficiaries. Little v. Sugg (Ala.), 8 So. 2d 866; 96 A.L.R. 613, 614. Unnatural and unexplained terms of a will may, in combination with other circumstances, be evidence of undue influence. Gardiner v. Goertner (Fla.), 149 So. 186. Undue influence implies certain weakness such as fear or inability to inquire or resist. It is determined by considering among other things the physical and mental condition of the testator and not by considering the effect such influence would have upon the mind of the ordinary strong and intelligent person. Page on Wills (Lifetime Ed.), sec. 185.

But, strictly, an order adjudging invalidity of Dan Langille's will may not be predicated directly on undue influence. It is said that undue influence presupposes mental capacity, which is true insofar as lack of capacity makes further inquiry into undue influence unnecessary. Page on Wills (Lifetime Ed.), sec. 185. In this case it has been deemed necessary to evaluate Gertrude's influence in relation to the decedent's ultimate state of mind in order to determine properly the issue of *devisavit vel non.*

On August 12, 1948 Dan Langille lacked the requisite capacity to make a valid will. In a sense the influence of Gertrude and the incapacity of the testator were coefficient factors, but the incapacity was in part a result of the influence. For it was largely through his long rapprochement with Gertrude that Dan Langille became, superveniently, a person of warped mentality. The surviving influence, operating on him subconsciously when he made his will, was just one of numerous indications of his inability to think freely and coherently.

Dan Langille was a man of sharp complexes and contradictions, conditioned by time and circumstance to irrational thought and action. He was no ordinary eccentric. In acquiring or improving property he was superficially competent, but his ability to evaluate the ordinary situations of life had been impaired and finally lost during forty years behind the iron curtain of Gertrude's destructive influence. Among other things he was unable to consider his children in rational perspective. The loose ends of his earlier disrupted life vaguely disturbed him and urged him to action, but he could not discriminate without distorting. He could not put himself into his actions, and it is no reflection on the fine organiza-

tions named in his will to assert that his "charitable" attempts to compensate for the lost decades of his life were utterly incongruous. He wrote several letters for himself after a lapse of 37 years and showed pitiful glimmerings of human interest, but the damage to his mind and personality was irreparable. There was hardly anything about him consistent with normality, including the manner in which he used and disposed of his property.

As one possessing most of the essential parts of a picture puzzle might attempt in vain to assemble them in coherent outline, so Dan Langille was unable to put together a coherent plan. His condition might be euphemistically described as mental astigmatism. He could not project his thoughts in logical sequence of cause and effect. His mental vision was unable to focus in the third dimension necessary to rational perception.

Mental incapacity is, of course, a term of great relativity. There is a distinction, says the Supreme Court of Florida, between a condition of unsound mind and a condition of being insane to that degree where one may be said to be a lunatic. Clarke v. Knight, 94 So. 665. Dan Langille was not a madman, nor is such extreme dementia a necessary condition precedent to testamentary incapacity. An unsound mind may seem normal, even brilliant in some respects. It may be observant as to time and place and the identity of persons and things, yet incapable of correlating them because "it has not the regular use of understanding sufficient to deal with discretion in the common affairs of life." 44 C.J.S., Insane Persons, sec. 2.

A single serious impediment may vitally affect the whole reasoning process even though other faculties severally may seem to function normally. Specialists in psychology and psychiatry apparently disfavor the terms "monomania" and "partial insanity" in describing this condition on the ground that any such disorder would necessarily affect the whole mind. Page on Wills (Lifetime Ed.), sec. 142. The courts, however, continue to use these terms and since both courts and specialists recognize varying degrees of mental incompetence, the question is more or less academic. It is believed that the following excerpt from Israel Wechsler in his text on Clinical Neurology, 4th edition, page 4, aptly classifies the peculiar derangement of Dan Langille as of August 12, 1948 (a condition which continued through the remainder of his life) —

Many of the complexes which cannot reach consciousness directly because of the resistance of the conscious ego often find outlet by disguising themselves in some acceptable form. Sometimes the emotion is attached to other ideas which can pass the censorship, but in that

case they give rise to inexplicable conduct. Occasionally the repressed complex is regarded as belonging to somebody else. In that case it is known as *projection*, a mechanism which is very characteristic of the insane. As a refuge from conflict the complexes may, so to speak, be withdrawn into logic-tight compartments. Their ability to exist side by side without giving rise to conflict results in *dissociation*. This explains not only incongruous behavior, but also the utter inability of individuals to see that they are expressing absolutely opposed ideas or indulging in contradictory action. Thus, a person may in all sincerity extol peace and love and at the same time practice cruelty and war. Not being conscious, those thoughts and actions are not amenable to reason.

The contestant has sustained the burden or proof and the conclusion is that the will of Dan Langille dated August 12, 1948 was the product of a disordered mind without capacity to correlate in rational perspective the factors with which it dealt. The will was executed by one who lacked testamentary capacity.

It is thereupon ordered, adjudged and decreed that the instrument executed August 12, 1948 in the presence of Helen Perry, Mary E. Waller and John D. Harris is invalid in its entirety and does not constitute the will of Dan Langille, that the order entered April 19, 1950 admitting the said alleged will to probate and record and recorded in letters testamentary book 40, page 87, of this court be and the same is hereby set aside.

It is further ordered that the order of April 19, 1950 directing letters testamentary to issue, recorded in letters testamentary book 40, page 87, and the letters testamentary issued thereon, recorded in letters testamentary book 40, page 87, of this court are hereby severally set aside and revoked.