FULBRIGHT et al., *Appellants*, v. PERRY COUNTY et al.

Division Two, July 6, 1898.*

1. **Will**: CONTEST: PRIMA FACIE CASE. When the formal execution of the will according to the requirements of the statute is shown, and the subscribing witnesses testify to the sanity of the testator, and he is shown to be of proper age to make a will, a *prima facie* case in favor of the proponents of the will is made. It then rests on the contestants to overcome this *prima facie* case by substantial evidence.

2. ———: INCAPACITY: ECCENTRICITIES: DECEASED LEGATEES. Eccentricities of character in the testator, mental peculiarities, unusual conduct in the manner of cultivating his farm and in managing his property, and the living the life of a recluse, aloof from his relatives, do not establish an unsound mind, or show the testator incapacitated to dispose of his property by will, even though two of the legatees of small bequests are dead, and have been for some time when the will is made.

3. ———: ———: SUBMITTING ISSUE TO JURY. Where there is any substantial evidence that the testator was not of disposing mind and memory at the time of the execution of the will, the case should go to the jury.

4. ———: DEVISE TO COUNTY. A county may be a devisee in this State.

*Appeal from Cape Girardeau Circuit Court.*—HON. HENRY C. RILEY, Judge.

AFFIRMED.

*Edward Robb* and *W. J. Roberts* for appellants.

(1) It was the duty of the court to submit the questions of fact to the jury, and it would have been error on the part of the court to give the peremptory instruction, had contestants failed to introduce a single witness. *Schroeder v. Railroad*, 108 Mo. 322;

*NOTE.—Decided May 31. Motion for rehearing filed, which was overruled July 6, 1898.

*Gregory v. Chambers*, 78 Mo. 298; *Bryan v. Wear*, 4 Mo. 106; *Franke v. St. Louis*, 110 Mo. 516; *Young v. Ridenbaugh*, 67 Mo. 586; *Norton v. Paxton*, 110 Mo. 456. (2) The burden of proof is upon the party seeking to uphold the will. *Thompson v. Ish*, 99 Mo. 160; *Gay v. Gillilan*, 92 Mo. 264; *Jackson v. Hardin*, 83 Mo. 175; *Young v. Ridenbaugh*, 67 Mo. 588; *Couch v. Gentry*, 113 Mo. 248; *Harvey v. Sullen*, 46 Mo. 147. (3) The time of the inquiry should not have been limited to a few years before the date of the will. A certain state such as insanity having been shown, unless due to some accidental or temporary cause, will be presumed to have continued in the absence of a showing to the contrary. *State v. Lowe*, 93 Mo. 547; *State v. Howard*, 118 Mo. 127. (4) The evidence is sufficient to sustain the verdict. And this court should either in reversing the case enter up judgment in favor of contestants, or direct the lower court to do so.

*T. B. Whitledge, Chas. A. Killian, Wm. H. Miller,* and *Samuel Bond* for respondents.

(1) The court did not err in giving instructions on the part of defendants in the nature of a demurrer to the evidence. *McFadin v. Catron*, 138 Mo. 197; *Maddock v. Maddock*, 114 Mo. 35; *McFadin v. Catron*, 120 Mo. 252; *Cash v. Lust*, 142 Mo. 630; *Jackson v. Hardin*, 83 Mo. 186; *Howell v. Railroad*, 76 Mo. 84; *Landis v. Hamilton*, 77 Mo. 554; *Young v. Ridenbaugh*, 67 Mo. 574; *Long v. Moon*, 107 Mo. 339; *Norton v. Paxton*, 110 Mo. 456; *Hansman v. Hope*, 20 Mo. App. 197; *Bank v. Skeen*, 24 Mo. App. 124; *Rice v. McFarland*, 41 Mo. App. 498; *Mexico v. Jines*, 27 Mo. App. 534; 2 Am. and Eng. Ency. of Law, p. 153 and n. 2; *Herster v. Herster*, 116 Pa. St. 112; *Knauss' Appeal*,

114 Pa. St. 10; *Smith v. Bank*, 99 Mass. 611; *Kenner v. Kenner*, 9 Conn. 102; *Brown v. Torrey*, 24 Barb. [N. Y.] 584. (2) Counties may take a devise of real estate. Dillon on Mun. Corp. [3 Ed.], sec. 566; R. S. 1889, sec. 8845 and 3422; *Chambers v. St. Louis*, 29 Mo. 543; *Perrin v. Corey*, 25 How. (Ohio) 465; Beach on Pub. Corp., secs. 644–645. (3) The uniform rule of this court is not to disturb the finding of the trial court unless it is brought about by some error or misdirection of the court. *State v. Hope*, 121 Mo. 41; *Moon v. Railroad*, 73 Mo. 438; *Grove v. Kansas City*, 75 Mo. 672; *Fulkerson v. Mitchell*, 82 Mo. 13; *Baum v. Fryrear*, 85 Mo. 151; *Bank v. York*, 89 Mo. 369; *State v. Hert*, 89 Mo. 590; *Caruth v. Richeson*, 96 Mo. 186; *St. Louis v. Lanigan*, 97 Mo. 175; *Wire Co. v. Hardware Co.*, 97 Mo. 289; *Krider v. Milner*, 99 Mo. 145; *Gutridge v. Railroad*, 105 Mo. 520; *Pitts v. Sheriff*, 108 Mo. 110; *Godman v. Simmons*, 113 Mo. 122.

BURGESS, J.—This is a suit to set aside the will of John F. Fulbright, late of Perry county, Missouri. The suit was begun in the circuit court of said county, but by agreement of all parties the venue was subsequently changed to the circuit court of Cape Girardeau county where the case was tried at the August term, 1895.

For grounds for setting aside the will the petition alleges, that for a long time prior thereto and at the time the said supposed will was subscribed by the said John Fulbright, and also at the time the same was published and declared as and for his last will and testament, the said John Fulbright was not of sound and disposing mind, but on the contrary was of unsound mind, and wholly incapable of making a testamentary disposition of his property. The petition then prays that the probate of said supposed will may be revoked

and set aside, and that said instrument be declared inoperative and for naught held.

The answer of defendants denies that the testator was insane or of unsound mind at the time of the execution of the will in contest, and alleges that he was of sound and disposing mind at that time. That he died on the fifth day of October, 1894, and that his will was duly admitted to probate by the probate court of the county of Perry in this State on the fifteenth day of October, 1894, and prays that the said last will and testament be declared and established as the last will and testament of said John Fulbright.

A trial was had on the issues thus joined, and after the close of all the evidence, the jury in pursuance of an instruction of the court, returned a verdict for defendants. Plaintiffs appealed.

The will bears date March 27, 1893, and John Fulbright, the testator, died October 5, 1894. He was at the time of his decease about seventy-seven or seventy-eight years of age. He was never married, and lived for many years before his death all alone on his farm. The plaintiffs in this suit are his lawful heirs.

The testator at the time of his death owned a farm consisting of two hundred and thirty-five acres worth $30 per acre, and a small amount of personal property of but little value. By his will he gave to his sister Elizabeth Welker, who was then dead and had been for many years, and who died in the same county where he resided, $5; to Phillip Fulbright, a brother who had been dead for over eight years and who died in an adjoining county, he also gave $5; to Sarah Statler another sister, he gave $50; to Mary Jaco another sister, he gave $100; and the remainder of his property he gave to the county of Perry, in which he lived all of his life, and in which he died. The evidence showed that the

testator had been all his life an eccentric character, and believed in witchcraft. That he was called by many people "Fool John Fulbright," but when about of middle age he was for many years a money lender, and although of limited education he could count interest quite well, and was quite successful in the accumulation of property.

*Dr. Harris*, who was called to see him professionally in March, 1893, testified that he found him weak and suffering from general debility though he was not confined to his bed. That he called to see him on account of eye trouble. That he only talked to him a few minutes, and that he answered all the questions he asked him sensibly. That in addition to his eye trouble, he had kidney trouble. This witness declined to give his opinion with respect to the condition of the testator's mind at the time he saw him.

*Dr. A. L. Wilson*, a witness for contestants, testified that he treated the testator professionally in the summer or fall of 1892; that he then had kidney trouble. That he treated him after that when other complications had arisen; that he then had ulceration of the cornea of the eyes, which he thought was produced by kidney trouble and his mode of living. That in May or June following he was much improved and able to be out.

The witness being asked whether the testator was mentally sound in March, 1893, after he had stated that he was very weak and in a bad condition answered as follows: "A. Taking into consideration his age and disease, he was so far as I could see; to the best of my ability and knowledge. His mind may be perfectly sound but still in a weak condition. So far as I could state, his mind was sound, but weakened by age and disease.

"*Q*. I'll ask you then, Doctor, if before contracting these diseases or trouble that you have described, he had previously been a weak minded person, if the tendency or effect of these diseases and troubles subsequently contracted would be to still further weaken and affect his mind? *A*. I have known John Fulbright eight, nine or ten years; knew him when I saw him. Don't know if any one else ever treated him. I never treated him until in 1892. It is generally considered when a man is insane he suffers with some delusion, and writers claim at least without delusions there is not any insanity. From what I have heard I would suppose that Fulbright was rather eccentric in his condition.

"*Q*. Well, now, will you define the difference, Doctor, between eccentricity and insanity as you understand it? *A*. An eccentric man is not necessarily—it is not necessary for him to have a delusion, but writers claim that without delusions we don't have insanity, but to define a line between insanity and sanity is very hard to do.

"*Q*. I'll ask you, too, from your knowledge of Mr. Fulbright whether you consider him as capable of attending to his ordinary affairs as other men of his age and condition? *A*. I consider him capable of attending to the business that he did.

"*Q*. The ordinary business affairs? *A*. Business affairs of his.

"*Q*. I'll ask you to state from your knowledge of him, your connection with him as a physician, whether about March, 1893, you considered him of sufficient intelligence to know what property he had and to attend to his ordinary business affairs and to know whether or not he was making a will if he did make one? *A*. Yes, sir; I should think so."

There was some non-expert evidence to the effect that the testator was insane, but their opinions were based almost entirely upon his eccentricities.

*William Bingenheimer*, who was one of the attesting witnesses to the will, testified as follows: "I live about a mile from John Fulbright's house. I was there when the will in controversy was made. (Will shown witness and identified.) I saw Mr. Fulbright sign it and at his request signed it as a witness in his presence and in the presence of Mr. Schaefer, who also signed the will as a witness in my presence and in the presence of Mr. Fulbright.

"*Q.* What was the condition of his mind at that time? Was he able to attend to his ordinary business affairs? *A.* To my best belief he was.

"*Q.* He was able to attend to his business affairs and take care of himself? *A.* Yes, sir.

"*Q.* Do you think he was of sound mind then? *A.* Yes, sir.

"*Q.* Do you think he knew what he owned at that time? *A.* Yes, sir.

"*Q.* And in your opinion did he understand this will? Did he know who he was giving the property to? *A.* Yes, sir."

On *cross-examination* the witness stated that he did not say at the time he made the will any thing about what property he had, and I did not say any thing to him about it. I think he knew what he had. He spoke to me about it at his house about two weeks before that.

"*Q.* What property did he state that he had at that time? *A.* Nothing, only his farm and two horses that he had. That is all he stated. He had two horses which were sold at the sale. The horses were in very good condition. He had not been cultivating the place for the last two years. I could not tell how he managed

to live.  I took him over four or five loaves of light-bread at the time he was sick.  A loaf of bread would last him two or three days.  About the 15th of March, 1893, was when I took the first bread to him.  I also took him a half bushel of potatoes.  Do not know whether he ate the potatoes.  He was knocking around at the time; was in a worse condition than he had been. He was down in a pretty bad condition.  I went over there frequently; never found him in bed, or reading or doing anything except sitting on a chair.  Sometimes his head was drooped down.  He was not talkative.  He never visited his neighbors or went anywhere.  I don't know why he did not; I never asked him.  I base my opinion on my own knowledge that he was of sound mind.  I never saw anything wrong with him.  He lived there in seclusion about fourteen or fifteen years; never had anyone around there with him.

"*Q.*  Did he cultivate his place and keep it up as people generally do in that neighborhood?  *A.*  He kept his fences up just as good as anybody else does. He never cultivated his ground very much.  He had four or five acres in corn.  Did not sow wheat there for the last ten or twelve years, that I recollect of.  He had no hogs, no cattle; had a cat.  The two horses that were there he had had for twenty years.  He had an old piece of a wagon he had owned for twenty years.  Had two old plows lying around there.  About two years ago he bought a mower and hay-rake from Mr. Sachse and took them to his farm but he never used them.  He had no wheat sowed that year.

"*Q.*  Did he have any meadow there?  *A.*  Yes, sir.

"*Q.*  How much meadow?  *A.*  I guess about two acres.

"*Q.* What did a mower and hay-rake cost at that time! *A.* I can't tell.

"*Q.* Did he cut the hay? *A.* No, sir.

"*Q.* Did he ever say why he had bought that hay-rake and mower? *A.* Thought he would use them.

"*Q.* How many years ago was that? *A.* About two years ago. I saw some old corn in his crib that had been there as long as I can recollect, and I have known him for twenty years.

"*Q.* What was done with that corn? *A.* The mice and rats were eating it.

"*Q.* Why didn't he sell it? *A.* I don't know. I didn't ask him. I saw him with a new suit of clothes on about two or three years ago. Don't know what kind it was; was nothing extra; was a black suit; was not jeans. The only other time I saw him with a new suit of clothes was ten or fifteen years ago. He took sick on the 10th of March. I fed his two horses for him. Saw another old will of his at that time. I brought it from Appleton. It came from Jackson. There is a postoffice in Appleton and the postmaster gave it to me and told me to take it over to him, and he told me to read it to him and I read it to him and that was one of the old wills that he made himself. He could not read. He was sick at the time he made this will and from that time until he died. He was 77 or 78 years old. He never said anything at all that he had any more relatives. He never said anything about the others except those mentioned in the will and he said they were alive as best he knew.

"*Q.* How did it happen that there was anything said about any of them being dead or alive? *A.* He never said anything about that.

"*Q.* Well, you have just stated that they were alive as far as he knew. *A.* Mr. Schaefer asked him if that was all that he had or whether they were all

alive. He said as far as he knew they were all living. That is all that he stated.

"*Q.* He would not say hardly anything except in reply to the questions? *A.* Yes, sir. Sometimes he would.

"*Q.* Did he at that time? *A.* No, sir. Old man Fulbright died on the fifth day of October. I didn't tell Wm. Jaco that old man Fulbright wanted to will his property to the American Tract Society, and Mr. Schaefer and I tried to persuade him to will it to his relatives, and he refusing to do that, Mr. Schaefer says, "Will it to Perry county," and he said all right. He told me when he showed me that will that he wanted to will it to the American Tract Society, and I asked him what good it would do him, if he had any relation out there and he said no sir, he didn't. He just put up his mind that he wanted to will it to that association. I told him that was something I would not do, but still I told him it was his own way of doing and he could do just as he pleased. I never said whether he should will it to Perry county, and didn't make that statement to Mr. Jaco."

*Re-Direct Examination.* "When I got the will out of the postoffice and read it to him was when I had the conversation with Fulbright about the American Tract Society. That was the first week he took sick, and I think it was over a week after when he made this last will. He died about a year and a half after making his last will."

*Re-Cross Examination.* "He (Fulbright) wrote the will I got out of the office. He had sent it down to Mr. Davis at Jackson and Mr. Davis sent it back to him again."

*John H. Schaefer* who wrote the will, and was also

one of the attesting witnesses, testified that Fulbright sent Bingenheimer after him to come and write his will; that he wrote it in Fulbright's house; that he saw him sign it, and that he and Bingenheimer signed it as witnesses at the request of Fulbright, in his presence, and in the presence of each other. That Fulbright's mind at that time was sound. That he told him how he wanted the will written, and after he had written it, Fulbright asked him to read it over to him, which he did, and he said that it was the way he wanted it.

The only question for consideration is as to whether or not there was sufficient evidence of the insanity of the testator, and want of capacity to make a will, to take the case to the jury.

When the formal execution of a will according to the requirements of the statute is shown, as was done in this case, and the subscribing witnesses testify to the sanity of the testator, and he is of proper age to make a will, a *prima facie* case in favor of the proponents of the will is made out, and it then rests upon the contestants to overcome this *prima facie* case by substantial evidence. *Carl v. Gabel*, 120 Mo. 283; *McFadin v. Catron*, 138 Mo. 197.

In *Benoist v. Murrin et al*, 58 Mo. 307, it was said: "A disposing mind and memory may be said to be one which is capable of presenting to the testator all his property, and all the persons who come reasonably within the range of his bounty, and if a person has sufficient understanding and intelligence to understand his ordinary business, and to understand what disposition he is making of his property, then he has sufficient capacity to make a will. *Harvey v. Sullens*, 46 Mo. 147. In *McClintock v. Curd*, 32 Mo. 411, the most satisfactory test was declared to be, whether the mind and memory of the testator were sufficiently

sound to enable him to know and understand the business in which he was engaged at the time he executed the will. The Supreme Court of Vermont in the case of *Converse v. Converse*, 21 Vt. 168, lays down the doctrine that if the deceased was, at the time, capable of understanding the nature of the business and the elements of the will, that is, the nature and extent of his property and the persons to whom he meant to convey it, and the mode of distribution, it is sufficient; and in *Horne v. Horne*, 9 Ired. 99, it is said, it is sufficient if the testator knew what he was doing, and to whom he was giving his property."

Measured by the rule thus announced, had John Fulbright mental capacity to make a will? Considering the testimony most strongly in favor of the contestants, the claim that John Fulbright was of unsound mind, and had not sufficient capacity to make a will when he executed the instrument in controversy, is based upon certain peculiarities and eccentricities heretofore stated, and others of a similar character, and these are not enough to satisfy the unprejudiced mind that he had not sufficient mental capacity to make a will. They may all have existed, and still be consistent with his sanity at the time of the execution of the instrument.

In *Chafin Will* case, 32 Wis. 557, it was held that mental peculiarities and eccentricities of character and conduct of the testator very much like those of the testator in the case at bar were not sufficient evidence of testamentary incapacity to invalidate the will.

If there was any substantial evidence that the testator was not of disposing mind and memory as hereinbefore defined at the time of the execution of the will, then the case should have gone to the jury, but no such evidence was adduced. Mere peculiarities, and eccentricities of character of the testator were not inconsistent with his sanity.

Upon the other hand it was shown by the attesting witnesses to the will that he was sane, and there was no substantial evidence to the contrary. He always attended to his own business affairs and from all that appears did it as well as anybody could have done. For many years he lived the life of a recluse, aloof from his relations and all others, and it is not strange under the circumstances that he should have given his property to the county in which he had lived for so many years. There was no substantial evidence we think that John Fulbright was insane or that he did not have mental capacity sufficient to execute the will.

It is also contended that there is no authority for a county to take land under a will, and for that reason the will is void on its face. It has been repeatedly held by this court that a county is a *quasi* corporation, and may sue and be sued. In *Abernathy v. Dennis*, 49 Mo. 470, it was said: "Counties are mere subdivisions of the State for governmental purposes, capable, however, of holding the title in fee to such lands as may be donated to them for their own use." It is true in that case the land was donated to the county by the United States government, but if counties can accept the donation of lands from the government, why may they not take them by devise? There is no difference in principle. One is a grant from the government, the other a devise from an individual.

In *Bell County v. Alexander*, 22 Tex. 350, it was ruled that counties in that State, are bodies corporate, and may take, hold and dispose of private property for municipal uses; or such uses and purposes as subserve the public good, and the exercise of the local and subordinate legislative powers, with which they may be invested by the public law, or by private acts. There can be no question of the power of a county in this State to take land by devise as trustee for the use of the

inhabitants, or charitable institution of the county and if it may do this, it seems to logically follow that it may take land in its own right.

There are other questions argued by counsel for plaintiff, but they are of a very technical character, and could not possibly change the result, hence we do not undertake to pass upon them.

For these considerations we affirm the judgment. GANTT, P. J., and SHERWOOD, J., concur.