ARNA PROFFER v. LUTHER PROFFER and EUGIE PROFFER FREEMAN, Defendants, LUTHER PROFFER, Appellant.—114 S. W. (2d) 1035.

Division One, April 1, 1938.

*Rush H. Limbaugh* and *Taylor Smith, Jr.,* for appellant.

*J. Grant Frye* for respondent.

BRADLEY, C.—This cause contests the will of J. Frank Proffer, deceased. The cause was filed in Cape Girardeau County, but the venue was changed to Scott County. The ground for contest was lack of mental capacity. Plaintiff and defendants are sisters and brothers, and are the only children of the testator. Eugie Proffer Freeman was made a defendant, but filed no answer. She actively participated as a contestant. The verdict of the jury was in favor of the contestants and the judgment entered thereon set the will aside. Luther Proffer appealed, and the appeal was to the Springfield Court of Appeals. That court transferred the cause to this court on the theory that title to real estate is involved. [Proffer v. Proffer, 106 S. W. (2d) 51.]

Contestant (plaintiff below and respondent here) contends that title to real estate is not involved in the constitutional sense, and filed here a motion to transfer back to the Court of Appeals. This motion was taken with the case. On the other hand, contestee, appellant, says that title in the constitutional sense is involved and that jurisdiction of the appeal is in this court. There is no ground to give this court jurisdiction of this cause, except on the theory that title to real estate in the constitutional sense is involved. We first rule this question.

Under Section 12 of Article 6 of the Constitution, and Section 5 of the Amendment of 1884, if a case involves title to real estate, jurisdiction of an appeal of such case is in the Supreme Court. "To involve title within the meaning of the Constitution a judgment must adjudicate a title controversy. The judgment sought or rendered must be such as will directly determine title in some measure or degree adversely to one litigant and in favor of another; or, as some of the cases say, must take title from one litigant and give it to another." [Nettleton Bank v. McGaughey's Estate, 318 Mo. 948, 2 S. W. (2d) 771, l. c. 774, and cases there cited.] The Nettleton Bank case, on the question of title, has been cited with approval many times. In that case it appears that George W. McGaughey

died testate. His widow, Kathryn, administratrix of the estate, filed petition in the probate court for an order to sell real estate for the payment of the widow's allowances. Testator, in addition to the widow, left two minor children, and homestead rights were vested in them. The Nettleton Bank filed an intervening pleading setting up that it had an allowed demand against the estate representing an indebtedness incurred prior to the acquisition of the homestead by deceased, and asked that in view of its claim "the whole title to the land be sold, homestead interest included, for the payment of its debt as well as the widow's allowance." The probate court decided in favor of the bank and "ordered the whole title sold." The administratrix appealed to the circuit court, where the same ruling was made as in the probate court. The administratrix again appealed, which appeal was to the Kansas City Court of Appeals. That court held that jurisdiction of the appeal was in the Supreme Court. It was held by this court (en banc) that title to real estate was not involved in a constitutional sense and the cause was transferred back to the Court of Appeals.

The subject of when title to real estate is and is not involved, is considered quite at length in the Nettleton Bank case, and the excerpt above from that case defines, in general terms, about as well as can be, when and when not title is involved. The case of Karl v. Gabel, 48 Mo. App. 517, was a suit to contest a will which devised real estate. A trial resulted in the will being set aside, and the cause was taken by writ of error to the St. Louis Court of Appeals. That court transferred the cause to this court on the theory that title was involved. The case does not appear to have been ruled in this court. Moore v. McNulty, 76 Mo. App. 379, a will case, was transferred, by the St. Louis Court of Appeals, to this court on the theory that title was involved. In this court jurisdiction was assumed and the cause disposed of without discussing the question of jurisdiction. [Moore v. McNulty, 164 Mo. 111, 64 S. W. 159.] The case of Bingaman v. Hannah, 171 Mo. App. 186, 156 S. W. 496, was a will contest, and was transferred by the Springfield Court of Appeals to this court on the theory that title to real estate was involved. The subject is discussed at some length by the Court of Appeals. In this court all that was said on the question was: "The appeal was first taken to the Springfield Court of Appeals, but that court, on the theory that the title to real estate was involved, certified the case here." [Bingaman v. Hannah, 270 Mo. 611, l. c. 615, 194 S. W. 276.] In Burrier v. Jones (en banc), 338 Mo. 679, 92 S. W. (2d) 885, a will contest, the appeal was first to the Kansas City Court of Appeals, but was transferred to this court on the theory that title to real estate was involved, and this court ruled the case. However, in that case Macon County was a party. In the Nettleton Bank case (318 Mo. 948, 2 S. W. (2d) l. c. 775), giving illustrations when title is involved is this:

". . . or where, in a will contest, the will does not in terms devise real estate, but actually does," citing the Bingaman case, supra, by the Court of Appeals and by this court.

The cases are numerous that a suit to set aside a deed involves title to real estate, and we can perceive no difference in reason and principle, so far as concerns the question of title, in a suit to set aside a deed that conveys real estate, and a suit to set aside a will that devises real estate. In 41, University of Missouri Bulletin, 30, is a discussion on the subject of Appellate Jurisdiction in Missouri. Many phases are mentioned and cases cited. In the course of the discussion at page 36 it is said: "There would seem to be no good reason for saying a judgment in such a case (a will contest when the will devises real estate) would not involve title. The devisee's sole claim is under the will and an adjudication as to the will's validity would seem a direct adjudication as to the title between heir and devisee."

We rule that the Court of Appeals properly transferred the present cause, and that jurisdiction of the appeal is in this court.

■ Error is assigned on the refusal of the court at the close of the whole case to direct a verdict in favor of defendant; on the exclusion of evidence; and on plaintiff's Instruction No. 5.

Hereinafter, we refer, sometimes, to plaintiff, Arna Proffer, and defendant Eugie Proffer Freeman, as contestants, and to defendant Luther Proffer as proponent.

As stated, the ground relied upon to set aside the will is lack of mental capacity. Proponent introduced the subscribing witnesses and the will; made a prima facie case, and then rested. Thereupon contestants introduced their evidence, and thereafter proponent introduced additional evidence. The will was executed June 2, 1931, and the testator died August 1, 1935, at the age of nearly seventy-nine. Testator devised a farm of 127.5 acres to his son, Luther; to Eugie, a house and lot (testator's residence at time of his death) in Burfordsville, Cape Girardeau County; and to Arna, a three-acre tract of land in Burfordsville. The residue (worth about $600) went to the three children, share and share alike. The three-acre tract was worth about $75, and the house and lot devised to Eugie was worth from $1500 to $2000, while Luther's farm was worth about $5000.

At the time of the trial (March 18, 1936) Eugie's age was fifty-six; Arna's fifty-four; and Luther's forty-eight. Luther was married and had a family, several children. Eugie was married, but had no children, so far as appears. Arna had been married, but was divorced (no children), and for about ten years prior to testator's death she lived in his home. For many years prior to 1927, testator resided on his farm near Burfordsville, but in April that year he moved to town.

The testator had a severe attack of typhoid fever in 1926, and had

had heart leakage for about twenty-five years prior to his death. It is claimed by contestants that testator showed signs of mental depreciation shortly after the attack of typhoid fever, and that this depreciation was progressive, until his death. Contestants used twenty witnesses and proponent twenty-four. Prior to the fever attack testator (according to Eugie) had been prominent in the farm community where he lived; had been school director and constable "and did community work." He had been "shrewd, industrious, and a hard working man, just as honest as any one ever could be. . . . . Sat on juries in the circuit court. . . . He carried himself nice and wanted clean clothes every time he went out; he was nice with his hair; he was a fine looking man and kept himself that way. . . . He was jovial, kind, nice and agreeable in his family. . . . He sure did love his children."

Testator's wife died from dropsy and asthma, September 21, 1930. Cora Cauvey, who had known the family for many years, was in the home a short time prior to the wife's death. She testified that Arna and others were trying to remove a ring from Mrs. Proffer's swollen finger. The next day she was again at the home and said that testator "doubled up his fist and struck his leg and said, 'Gosh dang, you ought to have seen her trying to get that old ring off.' When he said that he acted like he was mad, and like it tickled him too." Contestants introduced evidence that after moving to town testator fed hot potatoes and hot milk to his pigs and that "sometimes they squealed," and "the pigs would jump around;" that "he would go out on the porch and stick his finger in the milk and run it up his nose and put it on his face;" that "he would take gasoline and wet his coat collar and sleeves and all and hang it by the heating stove." Arna testified that she hid the gasoline and that testator "laughed about it." And there was evidence that testator required Jimmie McClard, a young lad living in the family, to wash testator's soiled underwear in the horsetrough instead of a tub; that he would take medicine found about the house; that after his wife's death he took medicine prescribed for her; that he put up a sign on his gate for church people to stay out and "cursed and swore" because his wife joined the church; that he trapped his neighbors' chickens; took horse shoes, some plank and hinges that did not belong to him; went into his neighbor's field and pulled corn and carried it away; hid food about the house; was unable to understand that he had paid for a load of wood; reduced the price of corn in a trade after the trade was closed; sold corn for 50 cents per bushel on credit and 60 cents cash; traded a collectible note for $18 for a $2 pig, and had never tried to collect the note; paid $95 for a $15 mule. "At times his mind was just like a child; he had candy, apples, and oranges and he would sit and eat unconcerned."

About four years prior to the trial (March 18, 1936) he went to

a circus and got one of the halves of a watermelon partly eaten, and discarded by others (not of his family). His son-in-law (Freeman) asked him not to "do that," and he said, "My golly, that's what I want; that's what I was waiting for, for them to get away." And "he walked towards the show grounds, holding that watermelon up, eating out of it that way." A number of peculiar notions of testator was detailed by the witnesses. One was that his daughter, Arna, could be sent to the asylum.

Chris Freeman testified that he had several conversations with testator concerning a conversation that testator and John G. Putz "are supposed to have had about Arna." Putz is the justice of the peace who drafted the will. Freeman said that testator "told me John Putz advised him to get her (Arna) away from there, get her away from the house and throw her furniture and stuff out in the road and call the sheriff, and when she comes home she would naturally raise cain about it and to have her sent to the insane asylum; that John Putz told him he had a boy or girl the same way, and he had them sent to the insane asylum and said that was settled; he also told my wife that; he told that several different times. He would go to town and nearly every time he would say that's what John Putz told him." Another notion he had was that his wife was feigning in her last illness. Also, it appears that on occasions he exposed himself in the nude where he might be seen by people passing along the street, and on occasions appeared in the nude in the presence of his daughter, Arna. On one occasion when Arna had fallen down the steps and had broken her ankle testator "walked up" and according to the evidence of Chris Freeman, he asked testator to help him carry her into the house, and that he did not do so. Shortly thereafter he was asked why he did not help, and he said, "I hadn't watered my old mare this morning, she hadn't had a drop of water; I had to go water her."

In February, 1930, according to Arna, testator "packed his suit case" to go to Colorado and Hot Springs; set his suit case on the steps, went to the barn and to town "and never came back until late that evening." Sometimes testator would insist on doing the cooking. "He would make me (Arna) wait until he would get the batter cake in the pan and then he would go to the barn and then I would make bread. The batter cake he made was not fit to eat. . . . Every morning he didn't go to the farm he would go out in the garden and hoe up my beans when they would be that high; I would say, 'Here, you hoed up my beans yesterday morning, don't hoe the rest of these up,' and he would turn around and walk like he didn't hear me and go to planting corn and walk on my cucumbers and things. Every morning nearly when I would see him in the garden I would go out there until he would go out and he wouldn't go back until late in the evening; he would let it alone when I was

in there. He wouldn't plant the corn in rows. He went around here and there; he would hack around and when it would come up I would see it." He bought a hog, "fattened it to sell, and took a notion one morning he didn't want it. He said it walked like a mule. He kept trying to get rid of it; if he would meet women on the street he would want to sell it; he wanted to sell it to Blanche Wallace; wanted her to come up and look at the hog; he said he didn't like the looks of it; it got so it walked like a mule." "Elvis Allen's cow got out and went down the road; Mr. Proffer drove her down, put her in the barn and milked her, and went to Masterson's and tried to sell the milk. . . . At that time Mr. Proffer had a good cow. . . . His brother-in-law died down there and he wanted me (Chris Freeman) to take him down there to get his (the brother-in-law's) clothes. He said he wanted them for Luther. . . . Luther was fixed about as well as any farmer in the community about that time, financially." "I (Eugie) know about his deportment to single women or widows after mother died. He tried to marry every one that would have him. Arna had a friend come down there; he asked her that day at the dinner table about marrying him. He had never seen her before."

There are many more acts disclosed in the record as to the conduct of the testator, but it is not necessary to set all these out. A number of lay witnesses gave it as their opinion, from the facts detailed respectively by them, that testator was of unsound mind. Dr. H. S. Winter, a nephew of testator, gave it as his opinion that "a mentally sound man would not do most of the things I heard testified."

It appears that the testator looked after his own affairs up until his death. After the will was written by Justice Putz, it was read to testator, and he said, "This is the way I want it." The justice testified that testator said "something about Arna, his daughter, not treating him right; that was the reason he wasn't giving her as much property as he did the rest of them. If he made further comments upon his reasons for making the will as he did, I would have to guess at it. . . . I did not tell him once some people were treating me about like she (Arna) was treating him and I threw them out in the street and he ought to do her that way. I had a conversation with him about his daughter not treating him right, but I don't know whether it was the day before or after (the execution of the will, we infer); he wanted her out of the house; he came to me and asked how to get her out. I told him how to get her out legally. If he did anything to get her out, I don't know. No, sir, I did not tell him I had people to do me that way once and I threw them out. . . . I did not have a conversation with him about sending her to the insane asylum."

A. A. Boss, a banker in Jackson, Missouri, testified that he had

been connected with the Cape County Savings Bank for thirty-eight years; had known the testator for twenty-five years; had business dealings with him; that testator had money (mostly time deposits) in the bank all the time that witness had known him; that he very seldom had a checking account. "I saw him quite often; I don't know just how often; I would see him in the bank and on the street. When he came in the bank to transact business, sometimes I personally waited on him. I found him all right relative to taking care of his business, that is, in the transaction of his business in the bank. He continued to be a customer of our bank as long as he lived. At the time of his death he had a deposit in our bank. I saw him on the street occasionally and stopped and talked to him; sometimes he would come in the bank—we have a bench there—and I would talk to him. He handled his business like a good business man. . . . I did not notice any change in his mental condition during the last few years of his life."

C. L. Grant, another banker of Jackson, testified about to the same effect as did Boss. J. R. Mabrey, a banker of Jackson, had known testator all his (witness') life; saw him about once a month during the last ten years of his life; had conversations with him at the bank; visited the home when Mrs. Proffer died. "Mr. Proffer acted normal at the time of his wife's death. . . . Her passing seemed to hurt him."

Dr. Seabaugh testified that he had known testator for about thirty-two years; that he had treated him for chronic heart trouble; for typhoid fever, rheumatism, colds and "minor things;" that he saw testator on an average of once a week (not all professionally). "So far as I know he always transacted all his business. . . . I treated him during the time he had typhoid fever. That was about the year 1926. . . . I don't think I noticed any change in his condition before he had the fever and after. I always thought maybe his heart leakage was a little worse than it was before he had the fever. He recovered from the attack of fever. I did not notice any difference in his getting around and transacting his business after he recovered. He continued to do that in the same way after he recovered. As far as I know, that continued during the remainder of his life, he attended to his business as long as he lived. During the time I have known him, I have observed the working of his mind. From the experience I have had with him and the knowledge of his transactions, his condition and my treatment of him, in my opinion he was a man of sound mind." Many lay witnesses, who knew testator for varying periods of years, gave their experience and contacts with testator, and expressed the opinion that he was of sound mind.

In considering the demurrer to the evidence of contestants, the verdict being in their favor, the general rule obtains in a will contest as is the general rule, that we view the evidence in support of

the verdict in the most favorable light, and give to the verdict all legitimate inferences which the jury could have drawn from the evidence. [Smarr v. Smarr, 319 Mo. 1153, 6 S. W. (2d) 860; Berkemeier et al. v. Reller, 317 Mo. 614, 296 S. W. 739; Coberly v. Donovan (Mo.), 208 S. W. 47; Turner v. Anderson, 260 Mo. 1, 168 S. W. 943; Patzman v. Howey (Mo.), 100 S. W. (2d) 851.] "Competency to make a will is determined by the state and condition of the testator's mind at the time the will is made." [Schoenhoff v. Haering, 327 Mo. 837, 38 S. W. (2d) 1011, l. c. 1015, and cases there cited.] However, "it is well settled by the decisions of this court that evidence of occurrences and circumstances prior to and closely approaching the time of the execution of the will, and shortly subsequent thereto, which tends to shed light on the question of testamentary incapacity and tends to show the condition of testator's mind at the time of the execution of the will, is competent, and it is not required that proof of testamentary incapacity at the very moment be made by eyewitnesses." [Schoenhoff v. Haering, supra.]

"Sickness, old age and mere eccentricities, in general, are not sufficient in themselves, to overthrow a will on the ground of mental incapacity, nevertheless, each one of these may be taken into consideration with other facts in determining whether the testator is of such mental capacity," as the law requires to make a will. [Minturn v. Conception Abbey, 227 Mo. App. 1179, 61 S. W. (2d) 352, l. c. 358; Post v. Bailey et al. (Mo.), 254 S. W. 71; Berkemeier v. Reller, supra.] A harsh and "unnatural disposition" by will "is a circumstance which tends to discredit the maker's testamentary capacity." [Meier v. Buchter, 197 Mo. 68, l. c. 89, 94 S. W. 883, 6 L. R. A. (N. S.) 202, 7 Ann. Cas. 887; Everly v. Everly, 297 Mo. 196, 249 S. W. 88, l. c. 91.]

Among the cases relied on by proponent to support the contention that a submissible case was not made are Smarr v. Smarr, 319 Mo. 1153, 6 S. W. (2d) 860; Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772; Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739, 37 S. W. (2d) 430; Huffnagle v. Pauley (Mo.), 219 S. W. 373; Coberly v. Donovan (Mo.), 208 S. W. 47; Hahn v. Hammerstein, 272 Mo. 248, 198 S. W. 833; Archambault v. Blanchard, 198 Mo. 384, 95 S. W. 834; Plass v. Plass (Mo.), 202 S. W. 375; Winn v. Grier, 217 Mo. 420, 117 S. W. 48; Fulbright v. Perry County, 145 Mo. 432, 46 S. W. 955.

It was held in the Smarr case that the evidence was not sufficient to make an issue on mental incapacity. The testator was eighty-two. The opinion (319 Mo. 1153, 6 S. W. (2d) l. c. 864) sets out some of the typical facts detailed by lay witnesses and relied upon to support the contention of lack of mental capacity: "Testator was irritated by the use of disinfectants in the family laundry, made necessary by the presence of clothing from his son William, who lay ill in his home, and objected to the servant's charge of $2.50 for assist-

ing in the washing. When a neighbor came in to assist his wife, who suffered burns, in 1919, from which she finally died, he insisted on showing her the scorched baseboard in the room where the fire occurred. On a subsequent Sunday morning he scraped off this charred portion. When this neighbor came over the morning after his wife died, he said to her, 'We had bad luck last night, We lost Sally.' Afterwards he seemed to enjoy playing with children, though he had never done so before; started to change the garden fence and did not finish it; put several inches of clay on a flower bed; cut down the hollyhocks because he said they were growing too high; gave some old safety razor blades to neighbors as keepsakes; claimed that his daughter-in-law had not paid him for a chair and refused to let her keep some articles she said he gave her; forgot that a neighbor had returned a chicken; refused to let one of his wife's relatives have her dress bonnet. Sometimes he would talk with neighbors he had known all his life and other times he would not speak to or notice them, and would sit still for hours in a rocking chair; got lost in Warrensburg one night in December, 1920, in going to home of his brother-in-law; asked name of persons over and over again; repeated in his conversations; was restless and childish and could not remember things he had recently said; promised to lend a man some money and apparently forgot the promise; said a chair broke down with him when there was nothing the matter with the chair; fell over in a chair in the yard and said the chair fell in a hole, although there was no hole; and during his last sickness he said they had him in a sheep pen. These and like eccentricities and generalities scattered over a long period apparently form the basis of the opinions and conclusions given. They are not facts so connected, consistent, strong, and bearing upon the issue of testator's mental condition at the time he executed the will, as to lend the opinions and conclusions any persuasiveness, cogency, or weight."

None of the cases cited are stronger than the Smarr case, and we shall not review the others. In that case a son was the chief beneficiary under the will. Those who suffered because of the favor to this son, were a son and grandchildren.

Rex v. Masonic Home of Missouri, 341 Mo. 589, 108 S. W. (2d) 72, was a suit contesting a will. Mental incapacity was relied on. The estate was appraised at $38,000. The jury found against the will. On appeal this court held that there was no substantial evidence to make an issue on mental incapacity. Mary Huthmaker was the testatrix, and there was only collateral kin. She was eighty years old when the will was executed, and eighty-one when she died. The evidence on the part of the contestants on the question of mental incapacity was about as follows: Testatrix had spells of temper and would fly into a rage without cause. She picked up dead twigs and

small sticks fallen from trees on the lawn. On an occasion she ate her dinner, and then said she had not had dinner. She "had no religion; claimed that she had been locked in the bath room; thought she was eating carrots, when she was eating potato dumplings." She was "an awful curious woman;" asked the maid if she would take anything in her room. She would hide her pocketbook and change the hiding place, and "one time while she was eating a meal, went to the closet, took out her pocketbook and opened it;" took a piece of decoration from a Christmas tree, threw it on the floor and stepped on it; talked to herself; cut farm advertisements from magazines and said she could buy land, sell it, make money, and that she could have her money and bonds buried with her and nobody would get it; cut some pictures of bathing beauties from magazines, showed these pictures, "and then lifted her dress, partly exposing her leg, and said 'that is a shapely leg.'" She claimed that she had prepared herself some extra breakfast, when she had not. She would start talking on one subject, and suddenly change to another; claimed there was a rat in a barrel when there was not; asked a person if he did not think that the corpse of her dead sister (6 years younger) "looked like a sixteen year old girl," and said to another person that the dead sister was her daughter. She was stingy about the number of lights burned; often discussed religion didn't believe in God; got mad because a tractor went across her land without permission and demanded $10 and got it. She would buy enough to supply the table, but was close as to the amount cooked; hung some food in the cistern and let it spoil. She wore a man's coat, hat and shoes. She claimed that her sister-in-law had been in her (testatrix's) home "the day before," when she had not. She hammered with a piece of board against the window sill at night. She went in the house and locked the door when a man who was working for her approached. She claimed that her sister when sick was "putting on;" would insist on the sick sister eating when she had just finished her meal. She "would pound Mina (the sister who died) on the back with her fists."

There were physicians, who from hypothetical questions, expressed the opinion that Mrs. Huthmaker was of unsound mind. But as stated, this court held that an issue on mental incapacity was not made.

We think the facts in the present case stronger than in the Smarr and Rex cases. These are outstanding: Testator was unable to understand that he had paid for a load of wood; that he sold corn on credit for 50 cents per bushel, and for 60 cents cash; that he, without trying to collect, traded an $18 note for a $2 pig; and that he paid $95 for a $15 mule. Also it appears, measured by the demurrer, that testator had abandoned a long life of honesty,

and had on several occasions, as set out, committed petty thefts of the property of his neighbors. These thefts, in view of his former rectitude, were circumstances of substance which the jury had the right to consider in determining the question of testator's mental capacity.

We cannot say under this whole record that there was no substantial evidence to support the verdict setting the will aside.

■ Complaint is made on the exclusion of evidence. It appears from the offering that on the day following the death of the testator, Luther, Freeman and Putz, the justice, went to the probate judge's office where the sealed will had been left by the testator, and that Freeman asked that the will be opened and read, "repeated the request three or four times." The probate judge refused to open the will, unless Luther so authorized him. Luther did not authorize. The offering was, according to the record, for the purpose of showing "prior inconsistent statements" of Freeman. While on the stand Freeman testified that he did not insist that the will be read; "never told Luther to go ahead and open the will and read it . . . Did not ask Judge McDonald to read it." When Judge McDonald was asked to tell what occurred when Luther, Freeman and Putz came to his office, objection was made, and counsel for proponent said he wanted "to show the interest" of Freeman. The trial court remarked: "There isn't any question about interest in this law suit, I guess," and sustained the objection. In the brief complaint is made on the remark of the court, but no such complaint is made in the motion for a new trial. As to whether or not Freeman asked that the will be opened and read would not have aided the jury in determining whether or not testator was mentally capable to make the will. No harm could have come to proponent because of the exclusion of this evidence.

■ Complaint is made on contestants' Instruction 5. This instruction told the jury that if testator "did not have mind enough to understand the ordinary affairs of life," and then followed the other usual requirements as to mental capacity. It is conceded that the instruction has been approved, and it is not necessary to further consider this assignment.

The judgment should be affirmed and it is so ordered. *Ferguson, C.,* absent; *Hyde, C.,* concurs.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.